IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ALLAN M. JOSEPHSON,

*Plaintiff,*

*v.*

NEELI BENDAPUDI, President of the University of Louisville, in her official and individual capacities; GREGORY C. POSTEL, former Interim President and Executive Vice President of Health Affairs at the University of Louisville, in his official and individual capacities; BETH A. BOEHM, Executive Vice President and University Provost at the University of Louisville, in her official and individual capacities; TONI M. GANZEL, Interim Executive Dean of Health Affairs and Dean of the School of Medicine at the University of Louisville, in her official and individual capacities; KIMBERLY A. BOLAND, Interim Chair of the Department of Pediatrics at the University of Louisville, in her official and individual capacities; CHARLES R. WOODS, former Chair of the Department of Pediatrics at the University of Louisville, in his individual capacity; JENNIFER F. LE, former Interim Division Co-Chief of the Division of Child and Adolescent Psychiatry and Psychology and current Chief of the Division of Child and Adolescent Psychiatry and Psychology at the University of Louisville, in her official and individual capacities; BRYAN D. CARTER, former Interim Division Co-Chief of the Division of Child and Adolescent Psychiatry and Psychology and Chief of the Division of Psychology at the University of Louisville, in his official and individual capacities; WILLIAM D. LOHR, former Interim Division Co-Chief of the Division of Child and Adolescent Psychiatry and Psychology at the University of Louisville, in his official and individual capacities,

*Defendants.*

Case No: 3:19-cv-00230-RGJ

THE HONORABLE
REBECCA GRADY JENNINGS

JURY TRIAL DEMANDED

PLAINTIFF'S FIRST AMENDED VERIFIED COMPLAINT

1

Plaintiff Allan M. Josephson, by and through counsel, and for his First Amended Verified Complaint against Defendants, hereby states as follows:

## INTRODUCTION

1. The cornerstone of higher education is the ability of professors to participate freely in the "marketplace of ideas," where all viewpoints can be debated on their merits. That marketplace depends on free and vigorous debate among professors, a debate that often calls into question ideas, theories, and positions that many may consider accepted or "settled." In few areas is this marketplace more critical than in medicine, where treatments considered standard can be challenged and then refined, rejected, or affirmed so as to improve patient care. But at campuses throughout the country, this marketplace of ideas is under attack. All too often, university officials—including those at the University of Louisville ("University")—seek to silence, censor, and restrict those who express ideas to which they or others object.

2. Seeking to participate in this marketplace, Dr. Allan Josephson became a psychiatrist and entered the realm of academic medicine. Because of his impeccable credentials and national reputation, the University hired him in 2003 to lead its struggling Division of Child and Adolescent Psychiatry and Psychology ("Division"). During the almost fifteen years he held that Division Chief post, Dr. Josephson turned the Division around, building a program that now has a national reputation. He provided such superlative leadership that his supervisor (a defendant here) awarded him perfect marks in his 2014, 2015, and 2016 annual reviews.

3. But in late 2017, everything changed. That fall, the Heritage Foundation, a nationally known think-tank, invited Dr. Josephson to participate in a panel discussion, where he expressed his views and professional opinions on the treatment of youth experiencing gender dysphoria. After learning of his remarks, several University faculty and staff members objected to his views. They then learned that he had expressed similar views as an expert witness in various state and federal

cases. Rather than debating their differing views, they demanded that the University take disciplinary action against Dr. Josephson.

4.    Acceding to this pressure, Defendants demoted Dr. Josephson in November 2017—just seven weeks after his Heritage Foundation presentation and less than four weeks after first expressing any concerns to Dr. Josephson—to the role of a junior faculty member. In the following months, they continued to belittle and berate him; inflicted irreparable damage to his professional career and reputation; and reduced his salary, retirement benefits, and academic travel funds. Then, in February 2019, they announced that they would not renew his contract, effectively terminating him. They took all these retaliatory actions with an eye to ensuring that neither he nor anyone else dares to express viewpoints they find objectionable on medical and psychiatric issues.

5.    Defendants have retaliated against Dr. Josephson for exercising his First Amendment rights, have violated his First Amendment right to free speech, have violated the unconstitutional conditions doctrine, and have deprived him of due process and equal protection of law.

## JURISDICTION & VENUE

6.    This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

7.    This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

8.    This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and FED. R. CIV. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

9.    Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b)

and JOINT L. CIV. R. 3.1 because Defendants reside in this district and division and/or all of the acts described in this Complaint occurred in this district and division.

PLAINTIFF

10.   Dr. Allan M. Josephson is a resident of Kentucky and a professor at the University in its Division of Child and Adolescent Psychiatry and Psychology.

DEFENDANTS

11.   Defendant Neeli Bendapudi is the President of the University, having assumed that position in April 2018.

12.   Defendant Gregory C. Postel was the Interim President of the University, serving in that role from 2017 through April 2018.

13.   Defendant Postel is, and was at all times relevant to this Complaint, the Executive Vice President of Health Affairs at the University.

14.   As president, Defendant Bendapudi is the chief executive, educational, and administrative officer of the University.

15.   Defendant Bendapudi's authority and powers include oversight and control of the University.

16.   Defendant Bendapudi's duties include, among others, authorizing, executing, enforcing, and implementing the policies governing faculty members at the University and overseeing the operation and management of the University.

17.   As president, Defendant Bendapudi directly oversees Defendants Postel and Boehm, and when he was interim president, Defendant Postel directly oversaw Defendant Boehm.

18.   As president Defendant Bendapudi has the responsibility for final decisionmaking authority concerning faculty members at the University.

19.   As president, Defendant Bendapudi possesses the authority and responsibility for governing, overseeing, and disciplining faculty members at the University.

20.   As interim president, Defendant Postel had the same roles, duties, powers, authority, and responsibilities as Defendant Bendapudi.

21.   As president and interim president respectively, Defendants Bendapudi and Postel are and were aware of the retaliatory and unconstitutional actions taken against Dr. Josephson and did not instruct University personnel, including the other Defendants, to change or reverse those actions to comply with constitutional mandates.

22.   As president and interim president respectively, Defendants Bendapudi and Postel have (or had) the authority to review, approve, or reject the decisions of other University officials, including the other Defendants, regarding the decisions challenged herein.

23.   As president and interim president respectively, Defendants Bendapudi and Postel have authorized, approved, confirmed, sanctioned, and ratified the retaliatory and discriminatory decisions regarding Dr. Josephson that are challenged herein.

24.   As Executive Vice President of Health Affairs at the University, Defendant Postel oversees all of the health-related schools at the University, including the School of Medicine.

25.   Defendant Beth A. Boehm is, and was at all times relevant to this Complaint, the Executive Vice President and University Provost at the University.

26.   Defendant Boehm oversees all academic schools at the University, including the School of Medicine.

27.   Defendant Toni M. Ganzel is, and was at all times relevant to this Complaint, the Interim Executive Dean of Health Affairs and Dean of the School of Medicine at the University.

28.   As Interim Executive Dean of Health Affairs, Defendant Ganzel oversees all of the health-related schools at the University, including the School of Medicine.

29.   As Dean of the School of Medicine, Defendant Ganzel oversees all

departments and divisions of the School of Medicine, including the Department of Pediatrics and the Division.

30.   As Executive Vice President of Health Affairs, Defendant Postel directly oversees Defendant Ganzel in her role as the Interim Executive Dean of Health Affairs.

31.   Defendant Boehm directly oversees Defendant Ganzel in her role as Dean of the School of Medicine at the University.

32.   Defendants Postel, Boehm, and Ganzel each has decisionmaking authority concerning faculty members in the schools, departments, and divisions under his or her purview at the University.

33.   Defendant Postel, Boehm, and Ganzel each possesses the authority and responsibility for governing, overseeing, and disciplining faculty members in the schools, departments, and divisions under his or her purview at the University.

34.   As Dean of the School of Medicine, Defendant Ganzel directly oversees Defendant Boland and directly oversaw Defendant Woods.

35.   Defendant Kimberly A. Boland is, and was at times relevant to this Complaint, the Interim Chair of the Department of Pediatrics at the University.

36.   Defendant Charles R. Woods was at times relevant to this Complaint the Chair of the Department of Pediatrics at the University.

37.   Defendant Boland possesses (and Defendant Woods possessed when he was chair) the authority and responsibility for governing and regulating faculty in the Department of Pediatrics at the University.

38.   Defendant Woods' duties included overseeing Dr. Josephson.

39.   Defendant Boland's duties include overseeing Dr. Josephson and Defendants Le, Carter, and Lohr.

40.   Defendants Bendapudi, Postel, Boehm, Ganzel, and Boland each possesses (and Defendant Woods possessed when he was chair) the authority to review and

reverse the decisions challenged here.

41. Defendants Bendapudi, Postel, Boehm, Ganzel, Boland, and Woods are and were aware of the retaliatory and unconstitutional actions taken against Dr. Josephson and did not instruct University personnel, including the other Defendants, to change or reverse those actions to comply with constitutional mandates.

42. Defendants Bendapudi, Postel, Boehm, Ganzel, Boland, and Woods independently and in consultation with each other, are responsible for the retaliatory and unconstitutional actions taken against Dr. Josephson challenged here.

43. Defendants Bendapudi, Postel, Boehm, Ganzel, Boland and Woods, independently and in consultation with each other, participated in the retaliatory and unconstitutional demotion of Dr. Josephson challenged here.

44. Defendant Jennifer F. Le is, and has been since November 1, 2018, the Chief of the Division of Child and Adolescent Psychiatry and Psychology at the University.

45. Defendant Bryan D. Carter is, and has been since November 1, 2018, the Chief of the Section of Psychology in the Division of Child and Adolescent Psychiatry and Psychology at the University.

46. Defendant William D. ("David") Lohr is, and was at all times relevant to this Complaint, Associate Professor in the Division of Child and Adolescent Psychiatry and Psychology at the University.

47. Before December 4, 2017, Defendants Le, Carter, and Lohr were all faculty members in the Division, reporting to Dr. Josephson.

48. From December 4, 2017 to November 1, 2018, Defendants Le, Carter, and Lohr each served as Interim Division Co-Chief of the Division of Child and Adolescent Psychiatry and Psychology at the University.

49. During their tenures as Interim Division Co-Chief of the Division of Child and Adolescent Psychiatry and Psychology at the University, Defendants Le's, Carter's, and Lohr's duties included overseeing Dr. Josephson.

50.   During their tenures as Interim Division Co-Chief of the Division of Child and Adolescent Psychiatry and Psychology at the University, Defendants Le, Lohr, and Carter reported to Defendant Woods (and later to Defendant Boland).

51.   Defendants Le, Carter, and Lohr are and were aware of the retaliatory and unconstitutional actions taken against Dr. Josephson and have not instructed or recommended that University personnel, including the other Defendants, change or reverse those actions to comply with constitutional mandates.

52.   While overseeing Dr. Josephson, Defendants Le, Carter, and Lohr, independently and in consultation with each other, took retaliatory and punitive actions against Dr. Josephson.

53.   Defendants Woods is sued in his individual capacity.

54.   Every Defendant other than Defendant Woods is sued in his or her official and individual capacities.

FACTUAL BACKGROUND

## I.   Dr. Josephson is a distinguished scholar and psychiatrist.

55.   Dr. Josephson became a medical doctor in 1976 and a board certified psychiatrist in 1982. A true, accurate, and complete copy of Dr. Josephson's curriculum vitae is attached to this Complaint as Exhibit 1.

56.   Since then, he has received certifications from the American Board of Psychiatry and Neurology, the Royal College of Physicians and Surgeons in Psychiatry, the American Board of Psychiatry and Neurology in Child and Adolescent Psychiatry, and licenses in the states of Minnesota, Georgia, Kentucky, and South Carolina. Ex. 1 at 3.

57.   After his residency and fellowship, Dr. Josephson held teaching and clinical positions in psychiatry at the University of Minnesota Medical School and the Medical College of Georgia. Ex. 1 at 1–2.

58.   Ultimately, Dr. Josephson became a full professor of psychiatry at the

Medical College of Georgia and the Chief of its Division of Child, Adolescent, and Family Psychiatry. Ex. 1 at 1–2.

59.   Throughout the psychiatric community, Dr. Josephson has established an excellent reputation as a scholar and psychiatric clinician.

60.   Dr. Josephson is a Distinguished Life Fellow of the American Academy of Child and Adolescent Psychiatry, where he has been a member since 1982. Ex. 1 at 3.

61.   Dr. Josephson is a Distinguished Life Fellow of the American Psychiatric Association, where he has been a member since 1981. Ex. 1 at 3.

62.   Dr. Josephson is a Senior Fellow with the Group for the Advancement of Psychiatry, where he has been a member since 2007. Ex. 1 at 4.

63.   Dr. Josephson also is or has been a member of a variety of other professional associations, including the Association for Academic Psychiatry, the American Medical Association, the American Family Therapy Academy, and the American College of Psychiatrists. Ex. 1 at 3–4.

64.   Since 1985, Dr. Josephson has served as a member of the Committee on the Family of the American Academy of Child and Adolescent Psychiatry, and he chaired this committee for over ten years. Ex. 1 at 7.

65.   Since 1988, Dr. Josephson has served as a Specialist Site Visitor in Child Psychiatry for the Residency Review Committee (Psychiatry) of the Accreditation Council for Graduate Medical Education. Ex. 1 at 7.

66.   Since 1989, Dr. Josephson has served as a Senior Examiner in Child and Adult Psychiatry for the American Board of Psychiatry and Neurology.  Ex. 1 at 7.

67.   In 1988, Dr. Josephson served as a consultant to Dr. C. Everett Koop, the Surgeon General of the United States. Ex. 1 at 11.

68.   In his career, Dr. Josephson has given at least 29 invited lectures, at least 130 presentations to national or international groups, and at least 43 presentations to regional groups on issues related to child and adolescent psychiatry and the

integration of psychiatry and spirituality, among others. Ex. 1 at 12–29.

69.   In his career, Dr. Josephson has authored, co-authored, or edited at least 42 articles in scholarly journals and at least 24 books or book chapters, in addition to numerous other publications. Ex. 1 at 30–40.

70.   Dr. Josephson's academic work has focused on the areas of individual and developmental psychopathology, family therapy, psychiatric education, and the interface of religion or spirituality and psychiatry.

71.   Dr. Josephson has an international reputation as a leader in these fields and has earned several national and regional awards for his scholarly work. Ex. 1 at 4–5.

## II.   Dr. Josephson has had a long, distinguished career as a Division Chief at the University.

72.   Dr. Josephson joined the University's faculty on January 1, 2003, as Professor of Psychiatry and the Chief of the Division of Child and Adolescent Psychiatry and Psychology ("Division") (known then as the Division of Child and Adolescent Psychiatry).

73.   Before Dr. Josephson's arrival, the Division was struggling: (i) the Division had just six full-time faculty members; (ii) Division faculty members rarely made national presentations; (iii) Division faculty members published about two publications per year, as only two of those faculty were actively publishing; (iv) the Division had a struggling child and adolescent residency program; (v) the Division had a poor reputation for quality of clinical service, particularly within the Department of Pediatrics; and (vi) the Division's finances were unstable, with expenditures consistently exceeding income.

74.   Under Dr. Josephson's leadership, the Division has flourished. A true and accurate list of some of Dr. Josephson's accomplishments as Division Chief is attached to this Complaint as Exhibit 2.

75.   Under Dr. Josephson's leadership: (i)  the faculty of the Division has grown,

both numerically and in terms of an enhanced national profile; (ii) the Division's budget was balanced, beginning in 2013, largely due to income Dr. Josephson secured and carefully stewarded; (iii) the Division launched, re-launched, and expanded numerous programs; (iv) the Division dramatically increased its number of patients; and the Division transferred from the Department of Psychiatry to the Department of Pediatrics. Ex. 2 at 1.

76.   While Division Chief, Dr. Josephson: (i) maintained a rigorous clinical schedule; (ii) served as the chief executive officer of the Bingham Child Guidance Clinic (now the Bingham Clinic); (iii) taught extensively at all levels of the Medical School; (iv) gave 19 invited lectures, 57 presentations to national or international groups, and 12 presentations to regional groups; (v) maintained his reputation as a distinguished scholar and skilled clinician through a prolific publication record; and (vi) received or was a finalist for numerous awards from professional associations and the University. Ex. 2 at 2–3.

77.   Dr. Josephson's expertise in family therapy is and was widely known, as evidenced by his receiving numerous national referrals.

78.   In light of these accomplishments, Dr. Josephson received perfect scores—4.0 across the board—in his 2014, 2015, and 2016 annual reviews. True, accurate, and complete copies of these annual reviews are attached as Exhibit 3 to this Complaint.

79.   Before November 2017, in over thirty-five years of service at three major state universities, Dr. Josephson was never the subject of any disciplinary action.

80.   Before February 2019, no university had ever refused or declined to renew Dr. Josephson's contract.

## III.  Dr. Josephson exercised his First Amendment rights without incident.
### A.  Dr. Josephson served as an expert witness in numerous cases, including many civil rights cases.

81.   Throughout his career, Dr. Josephson has served as a consulting or testifying expert witness in over seventy legal cases, with over fifty of those occurring during

his tenure as Division Chief.

82. Under the School of Medicine's policies, full-time faculty members may serve as expert witnesses and legal consultants on their own time with prior approval.

83. Under the School of Medicine's policies, any full-time faculty members who serve as expert witnesses or legal consultants must pay a percentage of their earnings from these activities to School of Medicine and their department.

84. Throughout his career at the University, Dr. Josephson has complied with these policies governing his activities as an expert witness and legal consultant.

85. In 2014, Dr. Josephson was approached to answer questions about the treatment of youth experiencing gender dysphoria, given his national academic leadership in child and adolescent psychiatry.

86. Dr. Josephson had become concerned that the poorly supported, new treatments for children and adolescents experiencing gender dysphoria did not serve their long-term health interests.

87. The controversial new treatment for youth experiencing gender dysphoria involves accepting their self-asserted gender identity, prescribing puberty blocking medications and cross-sex hormones (*i.e.*, testosterone for females, estrogen for males), and ultimately guiding the individual towards various surgeries.

88. In 2014 and 2015, Dr. Josephson consulted with Alliance Defending Freedom in several cases involving youth experiencing gender dysphoria who demanded to use the showers, restrooms, and locker rooms opposite to their biological sex in the public schools.

89. As part of this consulting, Dr. Josephson prepared a position paper describing the possible harmful psychological effects of allowing youth experiencing gender dysphoria to use the showers, restrooms, and locker rooms opposite to their biological sex, both for themselves and for their fellow students.

90. In 2016, Dr. Josephson served as an expert witness in *Carcano v. McCrory*,

12

federal litigation over North Carolina's Public Facilities Privacy & Security Act.

91.  In his expert testimony in this case, Dr. Josephson outlined his views regarding human sexuality; the causes of gender dysphoria; and a more conservative, comprehensive, developmentally-based treatment for youth experiencing gender dysphoria, one that applies the standard psychiatric techniques for addressing a wide range of childhood psychological issues.

92.  Among other things, Dr. Josephson noted the following in his testimony:

    a.  Sex is fixed in each person at the moment of conception, immutable, based on objective genetic facts, and binary (*i.e.*, male (having a chromosomal complement of XY) or female (having a chromosomal complement of XX)).

    b.  Gender identity refers to one's basic sense of himself or herself as male or female and his or her emotional appraisal of this knowledge, is a social construct, cannot by definition be present at birth, and is culturally and societally influenced.

    c.  Children are not equipped psychologically to make many important life decisions and thus parents abdicate their responsibilities if they allow children to "decide for themselves" regarding key life decisions.

    d.  Trying to change one's sex often involves permanent social, medical, psychiatric, and other consequences that cannot be fully appreciated until adulthood (*e.g.*, psychopathology, suicidal behavior, peer rejection, and permanent sterility).

    e.  Research shows that 65% to 95% of children and youth who experience gender dysphoria will cease to experience it by late adolescence.

    f.  Thus, youth experiencing gender dysphoria should receive individual therapy to understand the factors that fuel their desire to become a member of the opposite sex and attempt to resolve any conflicts. They should receive empathic guidance in aligning their feelings with their biological sex, which

13

may take some time, rather than exclusively and quickly being affirmed in the belief that they were born in the "wrong body."

g. Parents should receive guidance in helping children experiencing gender dysphoria feel more comfortable with their biological sex, while being sensitive to the anxiety children often feel during therapy.

h. Youth experiencing gender dysphoria must always be affirmed as a person, but this does not mean that parents or medical professionals should affirm their desire to become a member of the opposite sex before the issues are explored. This is consistent with parental approaches to all the major life decisions of their children.

93.   In 2016 and 2017, Dr. Josephson served as an expert witness in several other cases involving issues of gender dysphoria in children and adolescents, expressing views similar to those outlined above.

94.   In the fall of 2017, Dr. Josephson served as an expert witness in a federal case involving a Florida school district and gender dysphoria issues.

95.   In providing all of this expert testimony, Dr. Josephson expressed his own personal and professional views on his own time; he did not speak for the University.

96.   Defendants retaliated against Dr. Josephson for expressing these views in his expert testimony, even though he did so on his own time and off campus.

97.   Dr. Josephson's work as an expert witness never disrupted the University's or Division's efficient provision of services to the public or to its constituents.

98.   No classes, appointments, or other events or services at the University or Division were cancelled or disrupted as a result of Dr. Josephson's work as an expert witness.

**B. Dr. Josephson discussed his conservative, developmentally-based approach to treating youth with gender dysphoria in a public speech.**

99.   In 2017, the Heritage Foundation invited Dr. Josephson to appear on a panel

presentation in Washington, D.C. discussing gender dysphoria in children.

100. The Heritage Foundation is "the nation's largest, most broadly-supported conservative research and educational institution."

101. As one of the most widely respected conservative think-tanks in the country, the Heritage Foundation promotes principles of free enterprise, limited government, individual freedom, traditional American values, and a strong national defense.

102. The Heritage Foundation pursues its mission "by performing timely, accurate research on key policy issues" and by "effectively marketing these findings to [its] primary audiences:   members of Congress, key congressional staff members, policymakers in the executive branch, the nation's news media, and the academic and policy communities."

103. On October 11, 2017, Dr. Josephson participated in Heritage Foundation's panel presentation entitled *Gender Dysphoria in Children:   Understanding the Science and Medicine.*

104. Dr. Josephson's fellow panelists included Dr. Michelle Cretella, President of the American College of Pediatricians, and Dr. Paul Hruz, Associate Professor of Pediatrics at the Washington University School of Medicine.

105. Dr. Ryan T. Anderson, the moderator, opened by noting that each panelist would be speaking as an individual, not for any organization.

106. Dr. Cretella then outlined her views on the issues involved in treating children and adolescents experiencing gender dysphoria.

107. Among other things, Dr. Cretella noted:

   a. Biological sex is not assigned. It is imprinted by our DNA at the moment of conception, is in every cell of our bodies, and is binary.

   b. Identity is not biological. It has to do with our thoughts, feelings, and self-perceptions, which are not hardwired before birth and which may be factually correct or factually wrong.

c. In the majority of cases where one identical twin claims to be transgender, the other does not, proving that gender identity is not biologically set before birth.

d. The new method for diagnosing a child with gender dysphoria is to assess whether the child consistently and persistently insists that he is not his biological sex. If so, the child is socially transitioned (*e.g.*, given a new name) and prescribed puberty blockers to arrest his physical development and cross-sex hormones (*i.e.*, estrogen for boys, testosterone for girls), setting the stage for various surgeries.

e. Using puberty blockers in this fashion is an off-label use, is not authorized by the Food & Drug Administration, and can create memory problems.

f. Administering cross-sex hormones raises the risk of cardiac problems, stroke, diabetes, and various cancers, as well as depression, anxiety, and sterility. They are not benign medications.

g. This new treatment for youth experiencing gender dysphoria is not supported by science; it is ideology.

108. Next, Dr. Hruz outlined his views on the issues related to treating children and adolescents experiencing gender dysphoria.

109. Among other things, Dr. Hruz noted:

a. This new treatment for youth experiencing gender dysphoria has evolved very rapidly over about a decade. It originated in the Netherlands, where people stopped exploring the psychological basis underlying the dysphoria and instead began affirming it and attempting to align the body to what the mind believed, and it came to the United States about a decade ago.

b. Before this, it was widely recognized that gender dysphoria stemmed from a psychological condition, and the therapy focused on helping the individual come to terms with his or her body.

    c. Almost overnight, the paradigm shifted, and for ideological reasons, it was asserted that the mind was correct and the body diseased.

    d. There is no science to back this drastic change in treatment approach. The studies that exist are fundamentally flawed or have various weaknesses.

    e. Blocking puberty renders children sterile, and when this is followed with cross-sex hormones, it is generally understood that this is irreversible.

    f. Today, anyone who counters this new treatment is met with hostility. This is undermining the search for better, more effective, safer interventions.

110. Last, Dr. Josephson outlined, from the perspectives of clinical psychiatry and child development, his views on the issues related to treating children and adolescents experiencing gender dysphoria.

111. Dr. Josephson generally agreed with the views Drs. Cretella and Hruz expressed.

112. Among other things, Dr. Josephson noted:

    a. Gender dysphoria is a socio-cultural, psychological phenomenon, and cannot be fully addressed through medicine and surgery. Using these methods raises concerns that the real issue is not being treated.

    b. The new treatment neglects the developmental needs of children and relies on ideas that are just not true.

    c. The notion that gender identity should trump chromosomes, hormones, internal reproductive organs, external genitalia, and secondary sex characteristics when classifying individuals is counter to medical science.

    d. Children persistently, insistently, and consistently demand many things that are not good for them. A parent's role is to resist these demands when parental wisdom trumps children's limited life experience.

    e. Transgender ideology neglects the child's need for developing coping and problem-solving skills necessary to meet developmental challenges.

17

f.  When someone complains of pain, medical professionals generally seek to understand what causes the pain. When that inquiry is not allowed in the gender dysphoria context, the well-being of children is short-circuited, preventing us from diagnosing pain accurately, and an opportunity for developmental progress is missed.

113. During the question and answer period, Dr. Hruz noted that there has been and remains a significant effort to silence anyone who disagrees with or questions this new treatment for youth experiencing gender dysphoria.

114. Dr. Josephson emphasized that these youth need treatment and help, that he and his fellow panelists deeply respect their patients who face gender dysphoria, but that outside advocacy groups have silenced efforts to explore what types of treatments these youth need.

115. Dr. Josephson emphasized that the new treatment is inconsistent with child development principles and instead confuses them. After empathetically listening to their child, parents should use their collective wisdom in guiding their child to align with his or her biological sex.

116. Dr. Cretella detailed the flaws of studies that allegedly support this new treatment, noting that these studies assumed their conclusions, studied a small number of subjects, are short-term studies, rely on siblings as the control group, and depend on parents to assess how the child's mental well-being has improved.

117. Dr. Hruz noted that the optimal outcome for a youth experiencing gender dysphoria is for them to retain their normal fertility and avoid exposure to drugs with known harmful side effects.

118. Dr. Hruz noted that this new treatment is often presented as the only option, rather than allowing other treatments to be explored as well.

119. Dr. Josephson generally agreed with the views Drs. Cretella and Hruz expressed.

120. Shortly after this panel discussion, the Heritage Foundation published a recording of it on-line.

121. Defendants retaliated against Dr. Josephson for expressing these views at the Heritage Foundation, even though he did so on his own time and off campus.

122. Dr. Josephson's Heritage Foundation presentation never disrupted the University's or Division's efficient provision of services to the public or its constituents.

123. No classes, appointments, or other events or services at the University or Division were cancelled or disrupted as a result of Dr. Josephson's Heritage Foundation presentation.

## IV. Defendants retaliated against Dr. Josephson for exercising his First Amendment rights by demoting him.

### A. Defendants opposed Dr. Josephson's views and expression.

#### 1. The University's LGBT Center sounded the alarm.

124. Shortly after the Heritage Foundation published this presentation, officials at the University's LGBT Center became aware of it and were troubled at the views Dr. Josephson expressed.

125. Upon information and belief, the officials at the University's LGBT Center who became aware of and troubled at Dr. Josephson's Heritage Foundation presentation included Ms. Stacie Steinbock (the director of the LGBT Center at the University's Health Science Center) and Mr. Brian W. Buford (then the Executive Director of the LGBT Center).

126. Ms. Steinbock and Mr. Buford opposed and objected to the viewpoints Dr. Josephson expressed at the Heritage Foundation.

127. Upon information and belief, Ms. Steinbock and Mr. Buford (or other officials at the LGBT Center acting at their direction) contacted Dr. Christine Brady (an assistant professor in the Division) regarding Dr. Josephson's Heritage Foundation presentation.

128. Like Ms. Steinbock and Mr. Buford, Dr. Brady opposed and objected to the viewpoints Dr. Josephson expressed at the Heritage Foundation.

129. Upon information and belief, Ms. Steinbock and Mr. Buford (or other officials at the LGBT Center acting at their direction) discussed with Dr. Brady the need to ensure that some disciplinary or punitive actions were taken against Dr. Josephson due to the views he expressed at the Heritage Foundation.

130. Ms. Steinbock and Mr. Buford (or other officials at the LGBT Center acting at their direction) repeatedly asked Dr. Brady what would be done about Dr. Josephson's Heritage Foundation remarks.

131. Upon information and belief, Dr. Brady communicated what she had heard from Ms. Steinbock and Mr. Buford (or other officials at the LGBT Center acting at their direction) to Defendant Woods and Carter.

### 2. An impending subpoena revealed campus controversy.

132. On October 29, 2017, Dr. Josephson learned that Lambda Legal, the LGBT advocacy group representing the plaintiff in the federal case in Florida for which he served as an expert witness, intended to subpoena multiple University officials.

133. Dr. Josephson then scheduled a meeting on November 2, 2018, with Defendant Woods to inform him of this impending subpoena.

134. During this meeting, Defendant Woods stated that a number of "voices on campus" from "different corners of campus" had already contacted him to complain about Dr. Josephson's views regarding gender dysphoria and his willingness to challenge the new treatment for youth experiencing it.

135. This was the first time Dr. Josephson learned that his views and expression had sparked any complaints or objections on campus.

### 3. Defendant Carter and Dr. Brady confronted Dr. Josephson over his expression.

136. During the week of November 6, 2017, Dr. Josephson had several conversations with Defendant Carter and Dr. Brady.

137. Defendant Carter and Dr. Brady expressed their concerns about Dr. Josephson's views regarding the treatment of youth experiencing gender dysphoria based on his Heritage Foundation remarks.

138. Defendants Carter and Brady wrongly viewed Dr. Josephson as "hostile" to the treatment of patients experiencing gender dysphoria.

139. Dr. Josephson outlined a proposed program for treating youth experiencing gender dysphoria that involved cooperation between identified leaders from child psychiatry and pediatric endocrinology and detailed both how a patient would enter each system and be selected for medical and mental health treatments.

140. Dr. Josephson proposed that Dr. Brady could lead this proposed program in concert with endocrinology.

141. Defendant Carter and Dr. Brady curtly rejected Dr. Josephson's proposal.

142. Dr. Brady declared that she did not trust Dr. Josephson to treat children experiencing gender dysphoria, claimed that he was not qualified to do so, and impugned his overall knowledge of these patients.

143. At the time, Dr. Brady had barely three years of clinical experience, compared to Dr. Josephson's over thirty-five.

144. Dr. Brady cited Dr. Josephson's Heritage Foundation presentation and his expert testimony as the basis for her statements.

145. Dr. Brady claimed that Dr. Josephson's belief that many individuals experiencing gender dysphoria have manifest psychopathology was evidence of his discrimination against these individuals. To her, to diagnose is to discriminate.

146. Dr. Brady claimed that Dr. Josephson's belief that a young child (even a four-year-old) does not have the cognitive maturity to declare that he or she is actually a member of the opposite sex was evidence of his discrimination against individuals experiencing gender dysphoria.

147. Defendant Carter agreed with all of Dr. Brady's statements.

21

### 4. The LGBT Center rebuffed Dr. Josephson's bridge-building efforts.

148. In the fall of 2017, Dr. Josephson became aware that many faculty members displayed rainbow stickers in their offices to communicate support for LGBT people.

149. Dr. Josephson desired to post a rainbow sticker in his office and instructed his assistant to request one from the LGBT Center, which she did on November 10, 2017. A true, accurate, and complete copy of the request from Dr. Josephson's assistant is attached to this Complaint as Exhibit 4.

150. Three days later, Mr. Buford refused to provide Dr. Josephson the requested sticker. Ex. 4 at 1.

151. Mr. Buford refused to provide the sticker because he objected to the views Dr. Josephson expressed at the Heritage Foundation and in his expert testimony.

152. Mr. Buford falsely claimed that "Dr. Josephson has recently given speeches and taken part in other activities in which he refutes the existence of transgender identity." Ex. 4 at 1.

153. In actuality, Dr. Josephson never refuted the existence of gender dysphoria; he simply advocated a different method for treating individuals experiencing it.

154. Mr. Buford insisted that Dr. Josephson's expression "is in direct conflict with the spirit of the ally campaign." Ex. 4 at 1.

### 5. The subpoena spread word of Dr. Josephson's views.

155. On November 15, 2017, Ms. Rebecca Stahl, Associate University Counsel, e-mailed twelve University officials a copy of the subpoena that Lambda Legal had issued to the University's School of Medicine in connection with the federal case in Florida in which Dr. Josephson served as an expert witness. A true, accurate, and complete copy of Ms. Stahl's e-mail is attached to this Complaint as Exhibit 5.

156. Dr. Josephson, Defendants Woods and Carter, and Dr. Brady received a copy of this subpoena, which sought documents from various officials regarding gender dysphoria and related issues.

157. Upon information and belief, Defendants Postel, Boehm, Ganzel, Boland, Le, and Lohr were also made aware of the subpoena, as were Ms. Steinbock, Mr. Buford, and Dr. Chavis (Defendant Ganzel's chief of staff).

158. Having received or become aware of the subpoena, Defendants Postel, Boehm, Ganzel, Boland, Woods, Carter, Le, and Lohr—as well as Dr. Brady, Ms. Steinbock, Mr. Buford, and Dr. Chavis (among others)—knew (if they already did not know) that Dr. Josephson was serving as an expert witness in this case on behalf of the school district regarding the claims of a teenager experiencing gender dysphoria.

### 6. A few faculty members issued demands at a faculty meeting.

159. On November 15, 2017, Dr. Josephson presided over a regularly scheduled Division faculty meeting.

160. Dr. Josephson opened the meeting by announcing that he would represent the Division on the Department of Pediatrics' Diversity Committee.

161. During the weeks leading up to this faculty meeting, Dr. Josephson had sought volunteers to represent the Division on this committee.

162. As no one had volunteered, Dr. Josephson announced he would take on this responsibility.

163. Dr. Brady was outraged and declared, "You can't be our representative."

164. Defendant Le agreed with Dr. Brady.

165. Other faculty present said nothing for or against Dr. Brady's statement.

166. Upon information and belief, Dr. Brady said this because she believed the views Dr. Josephson expressed in his expert testimony and at the Heritage Foundation disqualified him from serving on this committee.

167. Defendant Carter claimed that Dr. Josephson should have alerted all Division faculty that he was serving as an expert witness.

168. Defendants Le and Carter, as well as Dr. Stocker (another Division faculty member), argued that Dr. Josephson had been deceptive in serving as an expert

witness without first informing all Division faculty.

169. However, Defendants Carter and Lohr have served as a testifying or consulting expert witness in other cases without notifying all Division faculty.

170. No University policy required Dr. Josephson to notify all Division faculty that he was serving as an expert witness.

171. But Dr. Josephson had notified Defendant Woods and other University officials of his role as an expert witness in several cases involving gender dysphoria.

172. Neither Defendant Woods nor any other University official had objected to Dr. Josephson providing these services.

173. Defendants Le and Carter, as well as Drs. Brady and Stocker, indicated that Dr. Josephson's views—as expressed in his testimony and/or in his presentations—offended them.

174. Defendant Le demanded that Dr. Josephson apologize to the University for the views he expressed in his expert testimony and at the Heritage Foundation.

175. Defendant Carter and Dr. Stocker agreed with Defendant Le's demand that Dr. Josephson apologize for the views he expressed in his expert testimony and at the Heritage Foundation.

176. Defendant Le demanded that Dr. Josephson hire a public relations firm or work with the University's public relations department to apologize to the University community for the views he expressed in his expert testimony and at the Heritage Foundation.

177. Dr. Stocker became incensed because certain media outlets had covered Dr. Josephson's Heritage Foundation presentation.

178. In all of Dr. Josephson's almost fifteen-year tenure as Division Chief (and in his over thirty-five years in academic medicine, including at two other major universities), this was the first time he faced such outcry from some faculty members.

179. During this entire faculty meeting, only Defendants Le and Carter and Drs.

Brady and Stocker expressed opposition to Dr. Josephson's views and expression.

180. The only reason these faculty members opposed Dr. Josephson at this meeting was the views he expressed on his own time and off campus in his expert testimony and Heritage Foundation presentation.

181. Other Division faculty members remained silent, intimidated by the vehement statements made by Defendants Le and Carter and Drs. Brady and Stocker.

182. The outcry expressed by these four faculty members never disrupted the University's or Division's efficient provision of services to the public or its constituents.

183. No classes, appointments, or other events or services at the University or Division were cancelled or disrupted as a result of the outcry from these four faculty members who objected to Dr. Josephson's views and expression.

184. Upon information and belief, either before or after this faculty meeting, Defendants Le, Lohr, and Carter and Dr. Brady communicated their objections to Dr. Josephson's views and expression to Defendants Woods, Boland, Ganzel, and/or Postel.

185. Upon information and belief, either before or after this faculty meeting, Defendants Le, Lohr, and Carter and Dr. Brady demanded that Defendants Woods, Boland, Ganzel, and/or Postel take disciplinary or punitive action against Dr. Josephson for expressing the views contained in his expert testimony and Heritage Foundation presentation.

### 7. Defendant Woods met with Dr. Josephson.

186. On November 16, 2018, Dr. Josephson met with Defendant Woods.

187. As Defendant Woods explained via e-mail, he wanted to meet with Dr. Josephson because he had "been hearing from a number of folks in the past couple of days." A true, accurate, and complete copy of Defendant Woods' e-mail regarding this meeting is attached to this Complaint as Exhibit 6.

188. During this meeting, Defendant Woods spoke from prepared notes.

189. Upon information and belief, before this meeting, Defendant Woods had consulted with (and was now acting at the direction of) Defendants Boland, Ganzel, and/or Postel.

190. Defendant Woods began by assuring Dr. Josephson that his speech was constitutionally protected and that he had every right to express his views.

191. During this meeting, Defendant Woods expressed concern to Dr. Josephson that "all your faculty are against you."

192. In actuality, only five faculty members—Defendants Le, Carter, and Lohr and Drs. Brady and Stocker—had opposed Dr. Josephson's views and expression.

193. These five faculty members opposed Dr. Josephson solely due to the views he expressed on his own time and off campus in his expert testimony and Heritage Foundation presentation.

194. The opposition to Dr. Josephson that these five faculty members expressed never disrupted the University's or Division's efficient provision of services to the public or its constituents.

195. No classes, appointments, or other events or services at the University or Division were cancelled or disrupted as a result of the opposition to Dr. Josephson (due to his views and expression) that these five faculty members expressed.

196. Dr. Josephson assured Defendant Woods that he would take the feedback he had received the day before seriously and would develop an action plan to resolve any issues with his faculty.

197. Given his over twenty-seven years of experience in leading two academic divisions of child psychiatry (*i.e.*, almost fifteen years leading the Division and twelve years in a similar position at the Medical College of Georgia) and in dealing with strong-minded faculty in an effective manner, Dr. Josephson was confident that he could resolve the issues that had arisen during the faculty meeting the day before.

198. But Defendants never gave Dr. Josephson a chance to address these issues.

**8. Defendant Woods convened another meeting with Dr. Josephson.**

199. On November 20, 2017 (*i.e.*, the Monday before Thanksgiving), Defendant Woods' assistant called Dr. Josephson, saying that Defendant Woods was insisting upon an urgent meeting.

200. When Dr. Josephson proposed meeting after Thanksgiving, Defendant Woods' assistant responded that Defendant Woods insisted upon meeting before then.

201. As a result, Dr. Josephson met Defendant Woods at an off-campus restaurant at the only mutually convenient time: the afternoon of November 22.

202. During this meeting, Defendant Woods stated (erroneously) that most of the Division faculty opposed Dr. Josephson.

203. In actuality, only five of the Division's twelve faculty members had opposed Dr. Josephson's views and expression.

204. These Division faculty opposed Dr. Josephson solely due to the views he expressed off campus and on his own time in his expert testimony and Heritage Foundation presentation.

**9. Defendants Ganzel, Boland, and Woods decided to demote Dr. Josephson.**

205. Sometime between November 20, 2017, and November 28, 2017, Defendant Woods met with Defendant Boland to discuss Dr. Josephson.

206. At this meeting, Defendants Woods and Boland decided to demote Dr. Josephson from his position as Division Chief.

207. Upon information and belief, in taking this action, Defendants Woods and Boland acted after consulting with, and with the approval of, Defendant Ganzel (and Dr. Chavis).

208. Shortly after the demotion, Dr. Chavis told an individual, "We've taken care of that," referring to Dr. Josephson's Heritage Foundation presentation.

209. When she said, "We've taken care of that," Dr. Chavis was referring to

Defendants' decision to demote Dr. Josephson from Division Chief.

210. Upon information and belief, Defendants Woods and Boland also consulted with and acted with the approval of Defendants Postel and Boehm.

211. Having decided to demote Dr. Josephson, Defendant Woods contacted Defendant Lohr, and Defendant Boland contacted Defendant Le, asking each whether they would be willing to lead the Division after Dr. Josephson's demotion.

**B. Less than seven weeks after Dr. Josephson spoke at the Heritage Foundation, Defendants demanded that he resign his position as Division Chief and effectively become a junior faculty member.**

212. On November 28, 2017, Lambda Legal deposed Dr. Josephson in connection with the federal case in Florida where he served as an expert witness.

213. In the middle of the day, Dr. Josephson received a text message from the Department of Pediatrics' executive secretary containing an urgent request to pick up a letter.

214. Later that afternoon, Dr. Josephson picked up this letter, which was from Defendant Woods. A true, accurate, and complete copy of Defendant Wood's letter is attached to this Complaint as Exhibit 7.

215. In his letter, Defendant Woods directed Dr. Josephson "to step down as Division Chief of Pediatric Psychiatry and Psychology." Ex. 7 at 1.

216. Upon information and belief, before instructing Dr. Josephson to resign as Division Chief, Defendant Woods had consulted with (and was now acting at the direction of) Defendants Boland, Ganzel, Boehm, and/or Postel.

217. Defendant Woods instructed Dr. Josephson to "submit a letter of resignation from your role as Division Chief of Pediatric Psychiatry and Psychology to my office this week, with an effective date of December 4, 2017." Ex. 7 at 2.

218. If Dr. Josephson failed to resign, Defendant Woods stated that he would "unilaterally remove [him] from this role effective on the date above." Ex. 7 at 2.

219. By giving Dr. Josephson the choice of resigning or being fired, Defendant

Woods demoted Dr. Josephson.

220. Defendant Woods demoted Dr. Josephson without consulting with the board of the Bingham Clinic, thereby violating the University's agreement with the board of the Bingham Clinic.

221. Defendant Woods stated that he was demoting Dr. Josephson because "the majority [of Division faculty] disagrees with your approach to management of children and adolescents with gender dysphoria." Ex. 7 at 1.

222. Upon information and belief, a majority of the Division faculty did not disagree with Dr. Josephson's approach to gender dysphoria. Some disagreed, others agreed, and still others were neutral; there was no majority consensus.

223. Upon information and belief, a majority of the Division faculty did not want to see Dr. Josephson demoted. Some favored his demotion, others opposed it, and still others were neutral.

224. For the faculty who favored Dr. Josephson's demotion, the only reason they did so was the views he expressed off campus and on his own time in his expert testimony and Heritage Foundation presentation.

225. Defendant Woods noted that Division faculty objected to "[Dr. Josephson's] views in this area, and the growing national recognition thereof." Ex. 7 at 1.

226. Defendant Woods explained that he demoted Dr. Josephson due to "the nature of this area of disagreement [regarding the treatment of children and adolescents with gender dysphoria] and your increasingly public promotion of your approach as an expert witness, and other issues, most notably perceptions of gender bias among your faculty." Ex. 7 at 1.

227. Defendant Woods claimed Dr. Josephson's views on treating youth with gender dysphoria varied from the University's official curriculum. Ex. 7 at 1.

228. Defendant Woods noted that he had previously discussed with Dr. Josephson his "ethical duties regarding how [he] present[s] opinions to trainees that differ from

the official curriculum of the school, and how [he] discuss[es] options for care of patients with them and their families/caregivers when approaches exist that differ from [his] own." Ex. 7 at 1.

229. Defendant Woods acknowledged that Dr. Josephson agreed with these statements: "You stated agreement with these principles when I reviewed them with you." Ex. 7 at 1.

230. However, at the time, the University had no official curriculum regarding the treatment of youth experiencing gender dysphoria.

231. To this day, the University has no official curriculum regarding the treatment of youth experiencing gender dysphoria.

232. Both before receiving this letter and in the months following his demotion, Dr. Josephson requested copies of any official curriculum the University had regarding the treatment of youth experiencing gender dysphoria.

233. Dr. Josephson was told repeatedly that the University had no such curriculum but that he would be sent a copy once such a curriculum was finalized.

234. In June 2018, Dr. Josephson was told that the University had developed such a curriculum, but as it was not yet published, he could not have a copy of it.

235. As a result, the phrase "official curriculum" had no discernible meaning, giving Defendants unbridled discretion to punish faculty who say things University officials do not like.

236. Due to the demotion, Defendant Woods ordered Dr. Josephson to "add a half day of clinical work per week when not on inpatient duty." Ex. 7 at 2.

237. Defendants Woods promised to "advocate to leave [Dr. Josephson's] salary intact through the end of this academic year." Ex. 7 at 2.

238. Due to the demotion, Defendant Woods made it clear that Dr. Josephson would report to the Interim Division Chief for Child Psychiatry, whose identity would be revealed on December 4, 2017. Ex. 7 at 2.

239. On the morning of November 29, 2017, Defendants Carter and Lohr visited Dr. Josephson's office and informed him that they would be taking over for him in light of his demotion.

240. That afternoon, Dr. Josephson submitted the forced letter of resignation that Defendant Woods demanded. A true, accurate, and complete copy of Dr. Josephson's resignation letter is attached to this Complaint as Exhibit 8.

241. Defendant Woods demoted Dr. Josephson by demanding his resignation as Division Chief less than seven weeks after Dr. Josephson's Heritage Foundation presentation (which was given off campus, on Dr. Josephson's own time, and in Dr. Josephson's individual capacity) and less than four weeks after first notifying him any concern.

242. By demoting him so quickly after the first concerns arose, Defendants never gave Dr. Josephson an opportunity to resolve issues with his faculty.

## C. Defendants leaked news of Dr. Josephson's demotion to discredit him as an expert witness.

243. At 12:01 p.m. on November 29, 2017, counsel for Lambda Legal received an e-mail from dr.josephson17@hotmail.com. A true, accurate, and complete copy of the e-mail counsel for Lambda Legal received is attached as Exhibit 9.

244. This e-mail indicated that "Dr. Josephson is resigning from his position as CEO from the Bingham [C]linic and as Chief of Psychiatry/Psychology effective Monday, Dec. 4th." Ex. 9 at 1.

245. Counsel for Lambda Legal passed this e-mail along to her opposing counsel, inquiring whether Dr. Josephson would still be called to testify. Ex. 9 at 1.

246. Counsel for Lambda Legal received this e-mail less than twenty-four hours after Dr. Josephson had been informed of his demotion and before he had submitted his letter of resignation.

247. Counsel for Lambda Legal received this e-mail five days before Dr.

Josephson's demotion was publicly announced.

248. Dr. Josephson did not send this e-mail to counsel for Lambda Legal and does not own or operate the dr.josephson17@hotmail.com e-mail address.

249. Upon information and belief, at the time counsel for Lambda Legal received this e-mail, only the following individuals could have known of Dr. Josephson's impending demotion:  Defendants Ganzel, Boland, Woods, Carter, Le, and Lohr, as well as Drs. Paul, Brady, and Chavis.

250. Upon information and belief, one or more of these individuals who knew of Dr. Josephson's demotion either (1) set up the dr.josephson17@hotmail.com account and sent this e-mail to counsel for Lambda Legal, or (2) shared the news of Dr. Josephson's demotion with the individual who set up this account and sent this e-mail to counsel for Lambda Legal.

251. Upon information and belief, one or more of these individuals who knew of Dr. Josephson's demotion either took these actions with the knowledge or intent that the news of the demotion would be conveyed to Lambda Legal.

252. Upon information and belief, one or more of these individuals who knew of Dr. Josephson's demotion sought to convey this information to counsel for Lambda Legal to undermine his role in that case and to affect the outcome of that case.

253. Defendant Woods did not announce Dr. Josephson's demotion until December 4, 2017. A true, accurate, and complete copy of Defendant Woods' announcement is attached to this Complaint as Exhibit 10.

254. Beginning on approximately December 5, 2017 (if not before), Dr. Brady engaged in extensive correspondence with attorneys from Lambda Legal to undermine Dr. Josephson's testimony. True, accurate, and complete copies of at least some of this correspondence are attached to this Complaint as Exhibit 11.

255. Dr. Brady announced that she sought to prevent Dr. Josephson from expressing his views regarding the treatment of youth experiencing gender dysphoria

ever again. *See* Ex. 11 at 5 ("I hope . . . this prevents him from engaging in this form of discrimination in the future!").

256. Defendants took no adverse employment action against Dr. Brady for expressing her views about the treatment of youth experiencing gender dysphoria.

## V. After the demotion, Defendants retaliated against Dr. Josephson for exercising his First Amendment rights by treating him in a belittling, humiliating fashion.

257. For over a year after the demotion, Defendants continued to retaliate against Dr. Josephson by subjecting him to a hostile, humiliating work environment, which manifested itself in numerous ways.

258. Defendants adversely affected Dr. Josephson's job duties and reputation on campus, effectively rendering him a junior faculty member in a hostile work environment.

259. Defendant Woods prohibited Dr. Josephson from attending Division faculty meetings.

260. Dr. Josephson was stripped of all leadership activities within the Division.

261. Dr. Josephson was stripped of his role as CEO of the Bingham Clinic without consulting with the board of the Bingham Clinic, thereby violating the University's agreement with the board of the Bingham Clinic.

262. Defendants replaced these leadership roles with clinical work assignments generally given only to junior faculty.

263. Dr. Josephson's inpatient call responsibilities had decreased commensurate with his senior faculty status.

264. As a result of Defendants' retaliatory actions, Defendant Woods placed Dr. Josephson back on regular inpatient call, a role typically given to junior faculty members.

265. Dr. Josephson's clinical duties consisted of consulting with Bingham Clinic therapists and clinicians, conducting individual and family psychotherapy at the

Bingham Clinic, and conducting specialty family therapy consultations.

266. Defendant Woods replaced these duties with 16 hours per week (with a goal of having at least 13 be billable) of outpatient therapy and having to re-join the regular faculty rotation for weekend inpatient therapy.

267. Dr. Josephson's non-clinical duties included managing the Division's clinical, educational, and scholarly activities; recruiting faculty and clinicians; serving on numerous boards; mentoring faculty; and serving on a task force studying the overuse of medication in foster children.

268. Defendant Woods took all of these activities away from Dr. Josephson.

269. Dr. Josephson's teaching duties included supervising outpatient therapy, assisting the training director in managing his or her programs, working with continuing medical education programs, teaching resident seminars, and directing ongoing recruitment necessary each year.

270. Defendant Woods stripped Dr. Josephson of his roles assisting training directors, also making it untenable to work with continuing medical education programs.

271. Dr. Josephson had no formal research requirement as part of his job duties, though he authored numerous works as part of his leadership role in the Division and in his field.

272. Defendant Woods required Dr. Josephson to generate scholarly research on an annual basis.

273. After Defendants Le, Carter, and Lohr became the Interim Division Co-Chiefs, the working environment for Dr. Josephson continued to deteriorate.

274. On March 23, 2018, Dr. Josephson met with Defendants Le, Lohr, and Carter.

275. During this meeting, Defendant Lohr accused Dr. Josephson of being "childish, narcissistic, and flippant."

276. During the same meeting, Defendant Le berated Dr. Josephson, claiming that

his views and his expression of them would prevent the Division from recruiting faculty.

277. In actuality, the Division has continued to recruit faculty without difficulty.

278. The Division began recruiting one faculty member before Dr. Josephson's demotion and finalized the hiring after the demotion. Since then, it has hired several other faculty.

279. During that same meeting, Defendant Carter falsely accused Dr. Josephson of lying, being deceptive, and withholding information.

280. During a July 9, 2018, meeting with Defendants Le, Lohr, and Carter, Dr. Josephson inquired how they had been selected to lead the Division after his demotion and pointed out that they needed to give more attention to the Bingham Clinic board.

281. Five days later, Defendants Le, Lohr, and Carter responded by sending Dr. Josephson a letter demanding that he again increase his clinical hours, for both outpatient and tele-psychiatry patients. A true, accurate, and complete copy of the July 14, 2018 letter from Defendants Le, Lohr, and Carter is attached to this Complaint as Exhibit 12.

282. Defendants Le, Lohr, and Carter discussed none of the issues presented in their July 14th letter with Dr. Josephson during their July 9th meeting.

283. In insisting that Dr. Josephson increase his clinical hours, Defendants Le, Lohr, and Carter considered only the number of hours scheduled for Dr. Josephson, not the number of hours he had actually performed.

284. By increasing Dr. Josephson's clinical hours once again, Defendants Le, Carter, and Lohr rendered it impossible for him to maintain his national leadership role in his profession or to continue any of the academic projects he had planned.

285. Dr. Josephson's clinical hours exceed those of most other senior faculty in the Division and are commensurate with the number of hours given to junior faculty.

286. Dr. Josephson has been assigned a level of clinical work that is more elementary and basic, the activities generally assigned to junior faculty.

287. In August 2018, Defendant Le decided that Dr. Josephson would only receive $2,700 in funds for academic travel, dues, and books for the upcoming academic year.

288. By giving Dr. Josephson only $2,700 in funds for academic travel, dues, and books, Defendant Le reduced his travel budget by $6,850 from the $9,550 he had received for the prior five academic years (*i.e.* by over 70%).

289. By cutting Dr. Josephson's funds for academic travel, dues, and books by over 70%, Defendant Le reduced him to the base travel budget generally reserved only for junior faculty members.

290. This reduction in his funds for academic travel, dues, and books is forcing Dr. Josephson to curtail his presence at national meetings and conferences and is preventing him from presenting papers he planned to present at such meetings.

291. In addition, these actions against Dr. Josephson chilled his protected expression, particularly on matters related to gender dysphoria.

292. In April 2018, Dr. Josephson cancelled a scheduled presentation at the annual meeting of the Christian Medical and Dental Association on the research regarding gender dysphoria in youth because of the demotion and fear that further remarks on this subject would spark additional adverse actions.

293. At various faculty meetings, presentations, and seminars, Dr. Josephson refrained from expressing his views, particularly on issues regarding gender dysphoria, when he would have otherwise expressed them because of the fear that further remarks on this subject would spark additional adverse actions.

294. At no point did Dr. Josephson engage in any conduct or expression that disrupted the University's or Division's efficient provision of services to the public or to its constituents.

## VI. Last, Defendants retaliated against Dr. Josephson for exercising his First Amendment rights by refusing to renew his contract.

295. On the afternoon of February 25, 2019, Dr. Josephson was scheduled to meet

with Defendant Le to discuss his 2018 annual evaluation.

296. Upon arriving at Dr. Le's office, Dr. Josephson discovered that Defendant Boland and Dr. In Kim, Vice Chair of Clinical Operations, would also attend this meeting, as they had arrived at her office ahead of him.

297. Dr. Josephson was surprised at Defendant Boland's and Dr. Kim's presence, as meetings to discuss an annual evaluation normally involve only the faculty member and his division chief.

298. At this meeting, Defendants Boland and Le did not discuss Dr. Josephson's 2018 annual evaluation or even present him with a copy of that annual evaluation.

299. Rather, Defendant Boland announced that the University would not renew Dr. Josephson's contract once it expired on June 30, 2019.

300. Defendant Boland explained that Dr. Josephson would soon receive a letter formally announcing this decision not to renew his contract from Defendant Ganzel.

301. Defendant Boland went on to thank Dr. Josephson for his work at the University and in the Department of Pediatrics.

302. Defendant Boland did not highlight any performance concerns or deficiencies as causing this decision not to renew Dr. Josephson's contract.

303. Instead, Defendant Boland said repeatedly that the Pediatrics Department had just decided to go in a "different direction."

304. Upon information and belief, Defendants decided to go in a "different direction" and not renew Dr. Josephson's contract because of the views he expressed off campus and on his own time in his expert testimony and Heritage Foundation presentation.

305. On March 2, 2019, Dr. Josephson e-mailed Defendant Boland, asking her to clarify what she meant by saying that the Department was moving in a "different direction." A true, accurate, and complete copy of Dr. Josephson's correspondence with Defendant Boland is attached to this Complaint as Exhibit 13.

306. Later that day, Defendant Boland responded, attempted to revise her remarks, and gave no reasons for the decision not to renew Dr. Josephson's contract. Ex. 13 at 1.

307. On March 5, 2019, Dr. Josephson received Defendant Ganzel's letter, dated February 26, 2019 (but not postmarked until March 4, 2019), formally notifying him that his contract would not be renewed. A true, accurate, and complete copy of Defendant Ganzel's letter is attached to this Complaint as Exhibit 14.

308. Defendant Ganzel noted that Defendant Boland had recommended not to renew Dr. Josephson's contract.

309. Upon information and belief, Defendant Boland made this recommendation because of the views he expressed off campus and on his own time in his expert testimony and Heritage Foundation presentation.

310. Defendant Ganzel noted that she had accepted Defendant Boland's recommendation.

311. Upon information and belief, Defendant Ganzel accepted Defendant Boland's recommendation not to renew Dr. Josephson's contract because of the views he expressed off campus and on his own time in his expert testimony and Heritage Foundation presentation.

312. Upon information and belief, before making her recommendations to Defendant Ganzel, Defendant Boland consulted with Defendant Le, who agreed with the recommendations Defendant Boland ultimately gave.

313. Upon information and belief, Defendant Le agreed with Defendant Boland's recommendations not to renew Dr. Josephson's contract because of the views he expressed off campus and on his own time in his expert testimony and Heritage Foundation presentation.

314. Upon information and belief, before deciding not to renew Dr. Josephson's contract, Defendant Ganzel had consulted with (and was now acting at the direction

of) Defendants Boehm, Postel, and/or Bendapudi.

315. Upon information and belief, Defendants Boehm, Postel, and/or Bendapudi agreed with Defendant Boland's decision not to renew Dr. Josephson's contract and instructed Defendant Ganzel not to renew it because of the views he expressed off campus and on his own time in his expert testimony and Heritage Foundation presentation.

316. During Dr. Josephson's career at the University, Defendants have never decided not to renew the contract of another faculty member in the Division.

317. It is very rare for the University to decide not to renew the contract of a full professor, and it is practically unheard of for the University to refuse to renew the contract of a full professor with more than fifteen years of service to the University.

318. Had Dr. Josephson not expressed his views regarding the treatment of youth experiencing gender dysphoria in expert testimony and at the Heritage Foundation, Defendants would have renewed his contract in early 2019, just as they had done every year since they hired him.

**VII. Defendants' retaliation has affected Dr. Josephson in numerous ways.**

319. Defendants' retaliatory actions against Dr. Josephson, including not renewing his contract, have impacted him, and will continue to do so, in numerous ways.

320. First, Defendants' retaliatory actions have adversely affected his professional reputation.

321. Before these retaliatory actions, Dr. Josephson was considered a leader in child and adolescent psychiatry, serving as chair, fellow, and distinguished life fellow in numerous professional organizations, including the American Academy of Child and Adolescent Psychiatry, the Group for Advancement of Psychiatry, the American Psychiatric Association, and the American Association of Directors of Child and Adolescent Psychiatry.

322. As a leader in his field, Dr. Josephson assisted these organizations by, among

other things, helping them develop policies.

323. Due to these retaliatory actions, Dr. Josephson's national leadership in his field has ceased or been substantially curtailed and diminished, an effect only magnified by the fact that Defendants now refuse to renew his contract.

324. For example, Dr. Josephson lost his position in the American Association of Directors of Child and Adolescent Psychiatry.

325. Dr. Josephson planned to complete numerous academic projects.

326. These projects included a book that was to be published by Oxford University Press, along with several others to be published elsewhere.

327. Due to these retaliatory actions, all of these projects had to be discontinued.

328. Dr. Josephson has also lost the ability to travel to the professional conferences necessary to maintain his leadership role in his profession and complete his planned academic projects.

329. Second, Defendants' retaliatory actions have adversely affected him financially.

330. Despite Defendant Wood's promise, Defendants reduced Dr. Josephson's salary by approximately $870 per month beginning in February 2018, or approximately $10,500 per year.

331. This salary reduction has also reduced Dr. Josephson's and the University's contributions to his retirement plans by 10%, or approximately $1,000 per year.

332. After June 30, 2019, Dr. Josephson will receive no salary, no benefits, and no further contributions to his retirement plans from the University.

333. Last, Defendants' retaliatory decisions and actions have rendered it impossible for Dr. Josephson to transfer to an equivalent position at similarly prestigious university or college.

## STATEMENTS OF LAW

334. At all times relevant to this Complaint, each and all of the acts and policies

alleged herein were attributed to Defendants who acted under color of a statute, regulation, or custom of the State of Kentucky (*i.e.*, under color of state law and authority).

335. Defendants knew or should have known that they were violating Dr. Josephson's constitutional rights by subjecting him to adverse employment actions, including but not limited to not renewing his contract (*i.e.*, effectively firing him), because of the views he expressed on matters of public concern as an expert witness and at the Heritage Foundation.

336. The decisions that led to the violation of Dr. Josephson's constitutional rights remain in full force and effect.

337. Dr. Josephson is not seeking relief related to Defendants' decision to demote him from his position as Division Chief in 2017.

338. Dr. Josephson has suffered and is suffering irreparable harm from Defendants' retaliatory and discriminatory decisions challenged here.

339. Dr. Josephson has no adequate or speedy remedy at law to correct the deprivation of his rights by Defendants.

340. Defendants' actions and policies, as set forth above, do not serve any legitimate or compelling state interest and are not narrowly tailored to serve any such interests.

341. Defendants' retaliatory and discriminatory decisions are not narrowly tailored as applied to Dr. Josephson because Dr. Josephson's expression does not implicate any of the legitimate interests Defendants might have.

342. Unless the decisions of Defendants are enjoined, Dr. Josephson will continue to suffer irreparable injury.

343. Under 42 U.S.C. §§ 1983 and 1988, Dr. Josephson is entitled to appropriate relief invalidating Defendants' challenged decisions.

## FIRST CAUSE OF ACTION
## Violation of Plaintiff's First Amendment Right to Freedom of Speech Retaliation
### (42 U.S.C. § 1983)

344. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–343 of this Complaint.

345. By punishing Dr. Josephson for expressing his views regarding the proper treatment of youth experiencing gender dysphoria through the retaliatory actions mentioned above, including not renewing his contract, Defendants have retaliated and are retaliating against Dr. Josephson for exercising his First Amendment rights.

346. When Dr. Josephson communicated his views regarding the proper treatment of youth experiencing gender dysphoria (both as an expert witness and at the Heritage Foundation), he was speaking on a matter of public concern, engaging in speech related to teaching and scholarship, and engaging in expression the First Amendment protects.

347. Dr. Josephson's interest, as a professor at a public university, in discussing matters of public concern in the context of teaching and scholarship outweighs Defendants' interest in the efficient provision of services.

348. Dr. Josephson's speech on matters of public concern in the context of teaching and scholarship never prevented Defendants from efficiently providing services to the public (or even threatened to do so).

349. Defendants' retaliatory and unconstitutional actions taken against Dr. Josephson would deter a person of ordinary firmness from exercising his right to free speech in the future.

350. Defendants' retaliatory and unconstitutional actions taken against Dr. Josephson constitute adverse employment actions.

351. Defendants took these retaliatory and unconstitutional actions against Dr. Josephson because of the views he has expressed on matters of public concern that were related to his teaching and scholarship, expression that the First Amendment protects.

352. Defendants subjected Dr. Josephson to adverse employment actions due to the content and viewpoint of Dr. Josephson's speech.

353. Defendants' retaliatory and unconstitutional actions taken against Dr. Josephson violate his right to free speech as guaranteed by the First Amendment to the United States Constitution.

### SECOND CAUSE OF ACTION
**Violation of Plaintiff's First Amendment Right to Freedom of Speech
Content & Viewpoint Discrimination
(42 U.S.C. § 1983)**

354. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–343 of this Complaint.

355. By punishing Dr. Josephson for expressing his views regarding the proper treatment of youth experiencing gender dysphoria through the retaliatory actions mentioned above, including not renewing his contract, Defendants have engaged in content and/or viewpoint discrimination in violation of the First Amendment.

356. Defendants evaluated the content and viewpoint of Dr. Josephson's speech to determine whether they would take any adverse employment actions against him based on what he said.

357. Defendants considered the content and viewpoint of Dr. Josephson's expression when they decided to take adverse employment actions against him.

358. Defendants retain unbridled discretion to discriminate based on content or viewpoint.

359. Defendants exercised this unbridled discretion when they punished Dr. Josephson for expressing his views regarding the proper treatment of youth experiencing gender dysphoria.

360. Defendants' retaliatory and unconstitutional actions taken against Dr. Josephson are unconstitutionally overbroad because they restrict a significant amount of constitutionally protected speech.

361. The overbreadth of Defendants' retaliatory and unconstitutional actions taken against Dr. Josephson chills the speech of Dr. Josephson, who seeks to engage in protected expression on and off campus.

362. Dr. Josephson's expression regarding the treatment of youth experiencing gender dysphoria is protected by the First Amendment.

363. By taking adverse employment actions against Dr. Josephson, Defendants have punished him for engaging in expression the First Amendment protects.

364. Defendants' retaliatory and unconstitutional actions taken against Dr. Josephson violate his right to free speech as guaranteed by the First Amendment to the United States Constitution.

### THIRD CAUSE OF ACTION
### Violation of Plaintiffs' Right to be Free from Unconstitutional Conditions (42 U.S.C. § 1983)

365. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–343 of this Complaint.

366. By conditioning Dr. Josephson's employment at the University on his willingness to surrender various constitutional rights, Defendants have imposed and are imposing an unconstitutional condition on him in violation of his First Amendment rights.

367. Defendants' retaliatory and unconstitutional actions taken against Dr. Josephson impose an unconstitutional condition upon faculty members' right to free speech and their receipt of state benefits (*e.g.*, avoiding disciplinary actions up to and including termination).

368. Defendants required Dr. Josephson to surrender his constitutionally protected rights to freedom of speech, due process, and equal protection to avoid disciplinary actions up to and including termination.

369. Defendants' retaliatory and unconstitutional actions taken against Dr. Josephson violate his right to be free from unconstitutional conditions.

FOURTH CAUSE OF ACTION
**Violation of Plaintiff's Fourteenth Amendment Right to
Due Process of Law
(42 U.S.C. § 1983)**

370. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–343 of this Complaint.

371. By punishing Dr. Josephson under vague and overbroad standards through the retaliatory actions mentioned above, including not renewing his contract, Defendants have violated and are violating Dr. Josephson's right to due process of law under the Fourteenth Amendment.

372. Defendants' retaliatory and unconstitutional actions taken against Dr. Josephson are overbroad because they encompass a substantial amount of constitutionally protected speech.

373. Dr. Josephson's expression regarding the proper treatment of youth experiencing gender dysphoria is protected by the First Amendment.

374. By taking adverse employment actions against Dr. Josephson, Defendants have punished him for engaging in expression the First Amendment protects.

375. Defendants' adverse employment actions against Dr. Josephson punished him for engaging in constitutionally protected expression in violation of Dr. Josephson's right to due process of law under the Fourteenth Amendment.

376. Defendants' adverse employment actions against Dr. Josephson, including punishing him for expressing views that allegedly varied from a nonexistent curriculum, are unconstitutionally vague because they grant University officials unbridled discretion in deciding what viewpoints regarding the treatment of youth experiencing gender dysphoria may be expressed without risking one's job, because they rely on assessments that are inherently subjective and elude any precise or objective measurement that would be consistent from one official or professor to another, because they are incapable of providing meaningful guidance to Defendants and other University officials, and because they force professors to guess whether

45

expression that the First Amendment protects is in fact allowed on campus.

377. The lack of objective criteria, factors, or standards in Defendants' adverse employment actions renders these actions unconstitutionally vague and in violation of Dr. Josephson's right to due process of law under the Fourteenth Amendment.

### FIFTH CAUSE OF ACTION
### Violation of Plaintiff's Fourteenth Amendment Right to Equal Protection of the Law
### (42 U.S.C. § 1983)

378. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–343 of this Complaint.

379. By punishing Dr. Josephson for expressing his views regarding the proper treatment of youth experiencing gender dysphoria through the retaliatory actions mentioned above, including not renewing his contract, when they would not punish professors who express opposite views on those same subjects, Defendants have violated and are violating Dr. Josephson's right to equal protection of the law under the Fourteenth Amendment.

380. Dr. Josephson is similarly situated to other professors at the University and in the Division.

381. Defendants take no adverse employment actions against professors who support the new treatment for youth experiencing gender dysphoria (*i.e.*, socially transitioning a child, administering puberty blockers and cross-sex hormones), but they take adverse employment action against professors, like Dr. Josephson, who either question that paradigm or propose alternative treatments.

382. Defendants' retaliatory and unconstitutional actions taken against Dr. Josephson have also discriminated intentionally against Dr. Josephson's rights to freedom of speech, right to be free from unconstitutional conditions, and right to due process of law. Thus, discriminatory intent is presumed.

383. Defendants' retaliatory and unconstitutional actions taken against Dr.

Josephson burden Dr. Josephson's fundamental rights and have no rational basis.

384. Defendants' retaliatory and unconstitutional actions taken against Dr. Josephson are underinclusive, prohibiting some expression while leaving other expression equally harmful to the University's asserted interests unprohibited.

385. Defendants took adverse employment actions against Dr. Josephson in a discriminatory and unequal manner, granting other professors the right to express their views on issues related to the proper treatment of youth experiencing gender dysphoria while denying that right to Dr. Josephson, in violation of Dr. Josephson's right to equal protection of the law under the Fourteenth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Josephson respectfully requests that this Court enter judgment against Defendants and provide him with the following relief:

A. A declaratory judgment that Defendants' retaliatory actions against Dr. Josephson, including not renewing his contract, treating him in a humiliating fashion, and discrediting him publicly, violated his rights under the First and/or Fourteenth Amendments;

B. A preliminary and permanent injunction ordering Defendants sued in their official capacities, their agents, officials, servants, employees, and any other persons acting on their behalf:

1. To renew Dr. Josephson's contract as a faculty member at the University; and

2. To purge Dr. Josephson's personnel file of any reference to the nonrenewal of his contract in February 2019.

C. Nominal, compensatory, and punitive damages for the violation of Dr. Josephson's First and Fourteenth Amendment rights;

D. Dr. Josephson's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

E. All other further relief to which Dr. Josephson may be entitled.

Respectfully submitted this 16th day of May, 2019.

*/s/ Travis C. Barham*

DAVID A. CORTMAN*
Georgia Bar No. 188810
TRAVIS C. BARHAM*
Arizona Bar No. 024867
Georgia Bar No. 753251
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
dcortman@ADFlegal.org
tbarham@ADFlegal.org

JOSHUA D. HERSHBERGER
Kentucky Bar No. 94421
**HERSHBERGER LAW OFFICE**
201 East Main Street
Madison, Indiana 47250
Telephone: (812) 274–0441
Facsimile: (812) 273–2329
josh@hlo.legal

TYSON C. LANGHOFER*
Arizona Bar No. 032589
JONATHAN M. LARCOMB*
Virginia Bar No. 47274
**ALLIANCE DEFENDING FREEDOM**
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
Facsimile: (202) 347–3622
tlanghofer@ADFlegal.org
jlarcomb@ADFlegal.org

* Admitted *pro hac vice*.

*Attorneys for Plaintiffs*

### DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable herein.

*/s/ Travis C. Barham*

TRAVIS C. BARHAM
*Attorney for Plaintiffs*

### DECLARATION UNDER PENALTY OF PERJURY

I, ALLAN M. JOSEPHSON, a citizen of the United States and a resident of the State of Kentucky, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing, that the foregoing is true and correct to the best of my knowledge (except as to statements made on information and belief, and those I believe to be true and correct), and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed this __15__ day of May, 2019, at Louisville, Kentucky.

_____
ALLAN M. JOSEPHSON

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16th day of May, 2019, I filed a true and accurate copy of the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to the following attorneys of record:

DONNA KING PERRY
Jeremy S. Rogers
James L. Bobbitt, III
**DISMORE & SHOHL, LLP**
101 South Fifth Street, Suite 2500
Louisville, Kentucky 40202
Telephone: (502) 540–2300
Facsimile: (502) 585–2207
donna.perry@dinsmore.com
jeremy.rogers@dinsmore.com
james.bobbitt@dinsmore.com

*Attorneys for Defendants*

Respectfully submitted on this the 16th day of May, 2019.

*/s/ Travis C. Barham*
Travis C. Barham
*Attorney for Plaintiffs*