# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION

| | | |
|---|---|---|
| **ALLAN M. JOSEPHSON** | ) | |
| | ) | **Case No. 3:19-CV-230-RGJ-CHL** |
| **Plaintiff** | ) | |
| v. | ) | |
| | ) | **(Electronically Filed)** |
| **NEELI BENDAPUDI, *ET AL.*** | ) | |
| | ) | |
| **Defendants** | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. JAMES M. CANTOR

This is a case involving various First Amendment claims. Josephson seeks to introduce the "expert opinion" testimony of Dr. James M. Cantor to opine about the correctness of Josephson's alleged protected speech. This testimony is unhelpful to the trier of fact and is unreliable as expert testimony. The Court should exclude it altogether.

Allan M. Josephson, a psychiatrist and former University of Louisville professor, maintains particular views on the treatment of gender dysphoric children, and he claims that his expression of those views motivated the Defendants and others to take certain actions against him. Expert witness Dr. Cantor believes Josephson's views reflect the state of the science as it existed at the time of Josephson's statements, but he also that testified that no discernible consensus exists regarding the appropriate treatment of individuals with gender dysphoria. Regardless, this case is not about the validity of Josephson's medical opinions. Instead, it is about whether his allegedly protected speech—no matter its scientific validity—motivated Defendants' actions. Dr. Cantor explicitly stated that he has no opinion on this question. (Ex. A, Cantor Dep. 32–33.) Furthermore, on the merits of Dr. Cantor's testimony, he has failed to identify any consensus that Josephson's views could be compared to.

## BACKGROUND

Josephson worked in the School of Medicine's Division of Child and Adolescent Psychiatry and Psychology (the "Division"), initially as Division Chief. (Am. Compl. ¶ 2, ECF No. 19.) Poor leadership and poor performance prompted his removal from the chief position and, later, the non-renewal of his contract with the University.

**1. Josephson's Chief Removal and Non-Renewal.**

In October 2017, Josephson participated in a panel discussion at the Heritage Foundation's Washington D.C. headquarters regarding children with gender dysphoria or transgender identity. (Am. Compl. ¶ 3.) Josephson's statements upset some individuals at the University (nonparties in this case) who disputed his views and representations of the science. Meanwhile, Division faculty members became increasingly frustrated with Josephson's leadership and mismanagement there. (*E.g.* Ex. D, Josephson Dep. 184, Nov. 28, 2017.)

These issues reached Charles Woods, who at the time chaired the School of Medicine's Department of Pediatrics (the "Department"). (Ex. E, Woods Dep. 13-14.) Woods initially hoped to help rectify Josephson's relationships with others, but he found that Josephson was no longer willing or able to lead the Division effectively. (Woods Dep. 178-79.) Ultimately, Woods asked Josephson to step down as Division Chief, and he did so. (Ex. F, Woods Letter, Nov. 28, 2017.)

Jennifer Le, Bryan Carter, and David Lohr then became interim Co-Chiefs of the Division. (Ex. G, Boland Email Nov. 28, 2017.) They developed work assignments for Division faculty members, including Josephson. (Ex. H, Boland Dep. 117.) In his role as a faculty member, Josephson consistently failed to meet his performance obligations regarding clinical and billable time. (*E.g.* Ex. I, Co-Chiefs Letter Jul. 14, 2018.) Ultimately, due to these performance shortfalls, Josephson's contract with the University was not renewed. (Boland Dep. 44-45.)

**2. This Case's Procedural History.**

Josephson filed suit in March 2019, naming several University officials as defendants. (Compl., ECF No. 1.) Because more than a year had passed since his chief removal, his related claims were time-barred. He subsequently amended his complaint, basing his claims on the later contract non-renewal. (Am. Compl., ECF No. 19, ¶ 337.)

Josephson asserts five causes of action: retaliation (Am. Compl. ¶¶ 344-53), discrimination (¶¶ 354-64), unconstitutional conditions (¶¶ 365-69), due process (¶¶ 370-77), and equal protection (¶¶ 378-85). He essentially claims that the Defendants retaliated and discriminated against him for protected speech in the October 2017 presentation. (Am. Compl. ¶¶ 3-5.) He has hired Dr. Cantor as an expert witness to address the veracity of his remarks in that presentation.

**3. Cantor's Credentials.**

Dr. Cantor is a psychologist. (Ex. C, Cantor Curriculum Vitae.) After receiving his Ph.D. in 2000, he became a full-time researcher at the Centre for Addiction and Mental Health's Law & Mental Health Program in Toronto, Canada. (Cantor Dep. 14.) There, he was promoted to section head, head of research, and senior psychologist. (Cantor Dep. 16, 22-23.) In these capacities, he shared some clinical duties and assisted colleagues with projects. (Cantor Dep. 14, 16, 22.) Throughout this period, he also held various academic positions from time to time. (Cantor Dep. 30-32.)

At the Law & Mental Health Program, Dr. Cantor studied "atypical sexualities" and "paraphilia," meaning non-standard sexual interest patterns. (Cantor Dep. 17-19.) Those topics ranged from simple traits (e.g. homosexuality, exhibitionism) to diagnosable conditions and criminal issues (e.g. sadism, pedophilia). (Cantor Dep. 17-20.) Most of Dr. Cantor's work involved sex offenders and pedophilia. (Cantor Dep. 14-15.) None of it directly involved transsexuality or gender dysphoria. (Cantor Dep. 15, 17, 22-23.)

In 2018, Dr. Cantor left to start his own clinic at the Toronto Sexuality Center. (Cantor Dep. 23-24.) There, he leads a team of clinical psychologists. (Cantor Dep. 24.) The clinic is a traditional psychotherapy practice, and it performs broader work than the Law & Mental Health Program. (Cantor Dep. 25.) Dr. Cantor's individual responsibilities are split between research consultation and clinical work. (Cantor Dep. 24.) His work includes "theoretical contributions," meaning analyses of prior original works, which assess their accuracy and validity. (Cantor Dep. 25-26.) Approximately 10 to 15 percent of Dr. Cantor's research, and about five to 10 percent of his patient treatment, directly involve transsexuality and gender dysphoria. (Cantor Dep. 26-27, 29.)

Dr. Cantor relied upon this background knowledge to prepare his opinion in this case. (Cantor Dep. 73-75.) Like his medical and academic work, most of his other expert witness work has involved criminal litigation and sex crimes. (Cantor Curriculum Vitae at 31; Cantor Dep. 9-13.) Only one other case has involved gender dysphoria. (Cantor Dep. 11-12.)

4. **Cantor's Opinion.**

The thrust of Dr. Cantor's opinion is that Josephson's comments in October 2017 were consistent with the prevailing science of the day. (Ex. B, Cantor Op. ¶ 10; Cantor Dep. 69.) But he also acknowledges that no discernable consensus actually exists among practitioners in the field regarding the treatment of individuals with gender dysphoria. (Cantor Op. ¶ 11; Cantor Dep. 45.)

Various professional organizations promulgate guidelines for medical professionals in this field. (Cantor Dep. 36-45.) Some are simply aspirational, while others make concrete recommendations for patient care. (Cantor Dep. 44-45.) According to Dr. Cantor, some of these guidelines are more scientifically legitimate than others. (Cantor Op. ¶ 10; Cantor Dep. 39-43.)

Dr. Cantor's "expert opinion" in this case is that Josephson's opinions were "entirely consistent" with, in Dr. Cantor's judgment, the only reliable science in the field. (Cantor Op. ¶ 10.) But Dr. Cantor ultimately concedes that there really is no professional consensus on the treatment of

children with gender dysphoria. (Cantor Op. ¶ 11; Cantor Dep. 45.) Thus, while Cantor might agree with Josephson's speech, his opinion is ultimately useless in this case.

Furthermore, Dr. Cantor admittedly does not know whether the research he points to accurately reflects the actual work of medical practitioners. (Cantor Dep. 69-70.) Some practitioners follow gatekeeping guidelines for patients seeking a medical transition, while others deem them unnecessary. (Cantor Dep. 45-47.) Still others only nominally endorse the gatekeeping approach, without strictly following it in practice. (Cantor Dep. 57.) Dr. Cantor ultimately admits that another expert with comparable experience to his could disagree with him and reach the opposite conclusion regarding the validity of Josephson's statements. (Cantor Dep. 71-72.)

Dr. Cantor has no university administrative experience. (Cantor Dep. 32.) He has not reviewed any materials or spoken with any University personnel about Josephson's employment there. (Cantor Dep. 32-33.) His expert testimony has no bearing whatsoever on whether Defendants' actions at issue in this case, namely Josephson's chief removal and contract non-renewal, were lawful.

## STANDARD

For a party proposing expert testimony, presenting a qualified expert "is only the first hurdle to clear." *United States v. Cunningham*, 679 F.3d 355, 379 (6th Cir. 2012). To be admissible, the proposed testimony itself must be both relevant and reliable. *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208 (6th Cir. 2015); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-93 (1993). The Court as "gatekeeper" must ensure that the testimony satisfies this two-part test. *Sierra Enters. v. SWO & ISM, LLC*, 264 F. Supp. 3d 826, 834 (W.D. Ky. 2017).

It is the proponent's burden to show that expert testimony is admissible. *EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 752 (6th Cir. 2014). The decision ultimately falls within the Court's discretion. *United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002).

**ARGUMENT**

Dr. Cantor's testimony fails both prongs of Rule 702's two-part test. It will not help the jury address any issue in this case and it is not a reliable presentation of the medical field's consensus view, if such consensus even exists. Accordingly, his testimony should be excluded from trial.

**I.      Dr. Cantor's Testimony Is Not Helpful.**

Expert testimony is relevant if it "will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a); *see also Bradley*, 800 F.3d at 208. This helpfulness concern is "[t]he 'touchstone' of admissibility of expert testimony." *Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Madej v. Maiden*, 951 F.3d 364, 370 (6th Cir. 2020) (quoting *Daubert*, 509 U.S. at 591). "Whether an opinion 'relates to an issue in the case' or helps a jury answer a 'specific question' depends on the claims before the court." *Id.*

This is not a case about the appropriate treatment of individuals with gender dysphoria. Nor is it a case about what approach for treating that patient population is correct or the best. Josephson's five alleged causes of action all center on his First Amendment speech rights. (*See* Am. Compl. ¶¶ 344–85.) Respectively, each count asks whether Defendants retaliated against, discriminated against, conditioned a benefit upon, punished, or mistreated Josephson *for speaking*—not because of the scientific validity (or lack thereof) of his speech. There is no requirement under the First Amendment that speech must be scientifically sound to be protected.

This means that, to prevail at trial, Josephson does not need to prove that his comments on gender dysphoria were consistent with prevailing medicine, or even medically legitimate. *See Madej*, 951 F.3d at 370. The veracity or validity of his comments is irrelevant to the merit of his claims, as correctness is not an element of any of them. A jury could flat-out assume either that Josephson's views were ironclad or that they were baseless; neither would impact the verdict reached. As such, Dr.

Cantor's opinion that Josephson's speech was consistent with his view of the science does nothing to assist the trier of fact to decide any issue in this case. It is purely superfluous and has no bearing on the ultimate issue to be decided by the jury, namely whether any Defendant retaliated against Josephson because of any speech protected by the First Amendment. As such, the Court should exclude Dr. Cantor as a witness at this trial.

Two similar cases are instructive. *Jackson v. E-Z-GO Division of Textron, Inc.* arose out of a fatal golf cart accident involving several minors. 326 F. Supp. 3d 375, 384 (W.D. Ky. 2018). The plaintiffs brought products liability claims against the golf cart's manufacturer and negligence claims against its owners. *Id.* The parties submitted several motions to exclude witness testimony. *Id.* Among those challenged were two defense witnesses (one expert and one lay) who "testified about legal issues related to the operation of golf carts." *Id.* at 438. The manufacturer acknowledged that the legality of the golf cart's operation during the accident was not a jury issue. *Id.* at 439. The court excluded "testimony about the law by these witnesses" because the testimony was unhelpful to the trier of fact in resolving the issues to be decided. *Id.* at 439-40.

*Wayne County Hospital, Inc. v. Jakobson* was an indemnity and subrogation action. 943 F. Supp. 2d 725, 728 (E.D. Ky. 2013). There, a hospital and insurance company had paid damages in an underlying medical malpractice case. *Id.* at 728-30. They subsequently filed suit against the physician in an attempt to recoup those damages. *Id.* at 728, 730. On summary judgment, the court found as a matter of law that an ostensible agency relationship existed between the hospital and physician, opening the door for an indemnification award by a jury. *Id.* at 735, 742. The defendant-physician submitted expert witness testimony "which directly mirror[ed]" his arguments against summary judgment. *Id.* at 742-43. The court noted that he could "have retained an expert to opine on the relevant standard of care." *Id.* at 744. But because the challenged expert's testimony addressed agency

law, there was "no factual issue with which [it] could help the jury." *Id.* at 744. The court excluded the expert's testimony and report. *Id.* at 745.

Just like the testimonies at issue in *Jackson* and *Wayne County Hospital*, Dr. Cantor's opinion here never actually lands on the issues of this case. No jury could ever be asked the singular question that Dr. Cantor addresses: whether Josephson's remarks about gender dysphoria were scientifically correct or what the best approach is for treatment of patients with gender dysphoria. Dr. Cantor's testimony could only distract jurors from the questions presented to them, not help with their fact finding processes. Accordingly, his testimony should be excluded.

**II.     Dr. Cantor's Testimony Is Not Reliable.**

Rule 702 is intended to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert*, 509 U.S. at 589. An expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Courts have "identified several non-exclusive factors that trial courts may consider in assessing reliability." *Wilden v. Laury Transp., LLC*, 901 F.3d 644, 649 (6th Cir. 2018). In this Circuit, those factors include: "(1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a high known or potential rate of error; [] (4) whether the technique enjoys general acceptance within the relevant scientific, technical, or other specialized community"; and (5) "whether the expert prepared his or her opinion solely for purposes of litigation." *Id.* (internal quotation marks omitted).

Josephson has offered Dr. Cantor's testimony for the proposition that his expressed beliefs reflect the medical field's consensus view. It is clear that, in Dr. Cantor's opinion, Josephson's October 2017 comments aligned with certain methods and approaches to treating children with gender dysphoria. It is also clear that, according to Dr. Cantor, the methods that Josephson advocated are

8

better than their medical alternatives. The problem is not that Dr. Cantor has assessed Josephson's views—it is that Dr. Cantor has not identified the field's prevailing view. (Cantor Dep. 69-70.) Instead, he has admitted there is not a discernible view regarding these issues.

Dr. Cantor has testified that this arena of psychiatry is complex and difficult to comprehensively assess. (Cantor Dep. 45-46.) Due to both legitimate medical differences of opinion and political or societal stressors, Dr. Cantor has been unable to determine what the actual consensus is (if any exists) among practitioners treating gender dysphoric children. (Cantor Dep. 69-70.) This "lack of testing" is a "[r]ed flag[] that caution[s] against certifying an expert." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). It also "flies against several of the factors" listed above. *Powell v. Tosh*, 942 F. Supp. 2d 678, 705 (W.D. Ky. 2013). In other words, Dr. Cantor's theory cannot be tested; he has utilized no peer-reviewed or published technique; the potential for error in his analysis in unknowable; and his analysis is not generally accepted within the relevant scientific community. *See Wilden*, 901 F.3d at 649.

The Court should not accept as valid Dr. Cantor's speculation about what that consensus view might be. *See Daubert*, 509 U.S. at 590. "No matter how good experts' credentials may be, they are not permitted to speculate." *Tamraz v. Lincoln Electric Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (cleaned up). Likewise, the Court should not permit Dr. Cantor to, before a jury, declare that something is a consensus view simply because he says it fits his view of the science. *See Kumho Tire*, 526 U.S. at 157. In short, because Dr. Cantor's opinion does not reliably identify the consensus view with which Josephson's comments purportedly align, his testimony should be excluded.

## CONCLUSION

Dr. Cantor's opinion is not helpful to the trier of fact in resolving any issue to be decided in this case. Additionally, Dr. Cantor's opinion that there is no discernible consensus regarding the

treatment of children with gender dysphoria means that, even if the jury were called upon to decide the correctness of Josephson's statements, it would have nothing on which to base its decision.

The jury will not be called upon to render an opinion about whether Josephson's speech was scientifically correct or medically sound. That Dr. Cantor agrees with Josephson's speech and thinks it is correct is irrelevant and immaterial to the issue the jury will be called upon to decide. The Court should exclude Dr. Cantor as a witness in this matter.

                                                      Respectfully submitted,

/s/ *Jeremy S. Rogers*
Donna King Perry
Jeremy S. Rogers
Matthew Barszcz
Sarah B. Abshear
Chase M. Cunningham
DINSMORE & SHOHL LLP
101 South Fifth Street, Suite 2500
Louisville, Kentucky 40202
Telephone: (502) 540-2300
Facsimile: (502) 585-2207
donna.perry@dinsmore.com
jeremy.rogers@dinsmore.com
matthew.barszcz@dinsmore.com
sarah.abshear@dinsmore.com
chase.cunningham@dinsmore.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

       I hereby certify that on October 28, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following attorney(s) of record:

David A. Cortman  
Travis C. Barham  
Alliance Defending Freedom  
1000 Hurricane Shoals Road Northeast,  
Suite D-1100  
Lawrenceville, Georgia  30043  
Telephone: (770) 339-0774  
Facsimile:  (770) 339-6744  
dcortman@ADFlegal.org  
tbarham@ADFlegal.org  

Joshua D. Hershberger  
Hershberger Law Office  
201 East Main Street  
Madison, Indiana 47250  
Telephone:  (812) 274-0441  
Facsimile:  (812) 273-2329  
josh@hlo.legal  

Tyson C. Langhofer  
Alliance Defending Freedom  
44180 Riverside Parkway  
Lansdowne, VA  20176  
Telephone:  (571) 707-4656  
Facsimile  (571) 707-4790  
tlanghofer@ADFlegal.org  

*Counsel for Plaintiff*

                                                          */s/   Jeremy S. Rogers*  
                                                          *Counsel for Defendants*