# Exhibit A

```
 1                    UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3

 4   ALLAN M. JOSEPHSON        )
                               )
 5         Plaintiff           )
                               )
 6   vs.                       )   CASE NO.
                               )   3:19-CV-230-RGJ-CHL
 7                             )
     NEELI BENDAPUDI, ET AL.   )
 8                             )
           Defendants          )
 9

10

11

12                    *         *         *

13        The videotaped deposition of JAMES M. CANTOR,

14   PH.D., taken pursuant to notice via Zoom by the

15   Defendants on August 2, 2021, with participants at

16   various locations due to the Kentucky Coronavirus

17   State of Emergency.

18

19

20

21              JENNIFER R. JANES, RPR, CRR
                   McLendon-Kogut Reporting
22                   Anchorage Office Park
          2525 Nelson Miller Parkway, Suite 204
23             Louisville, Kentucky 40223-3153
                      (502) 585-5634
24              jjanes@mclendon-kogut.com
                  www.mclendon-kogut.com
25
```

```
 1    this version.
 2    Q.    Okay.  And have you -- your CV notes some prior
 3    testimony.  I just want to walk through that very
 4    briefly.
 5          All right.  Dr. Cantor, let's start at the
 6    bottom and work our way up.  First thing noted on
 7    here is United States versus William Leford.  Am I
 8    correct that you offered testimony during a
 9    presentencing hearing?
10    A.    Yes.
11    Q.    Can you tell me the nature of that testimony?
12    A.    They wanted to know more about what was known
13    about treatment, outcomes of treatment, and different
14    indicators that would help estimate a person's risk
15    of committing new crimes.
16    Q.    And do you recall what sort of crimes were at
17    issue in that matter?
18    A.    Child porn possession.
19    Q.    Above that we have re: commitment of Nicholas
20    Bauer, a Frye hearing in Lee County, Illinois.  What
21    can you tell me about your testimony in that case?
22    A.    That and the other cases that I've done with
23    Illinois were all with the same question.  They --
24    these were people undergoing the sexually violent
25    predator requirements such that after they had served
```

1    their time, their diagnosis was being used to justify

2    the statement that they were a danger to society, and

3    instead of being released after incarceration, that

4    they should instead be hospitalized.

5        The mental health people who ran -- who

6    conducted the evaluations diagnosed him with a --

7    diagnosed him not with pedophilia but with a

8    phenomenon called hebephilia, which is attraction to

9    pubescent-aged children instead of attraction to

10   prepubescent-aged children.

11       The Court then wanted to know whether

12   hebephilia was accepted as a recognized diagnosis on

13   par with pedophilia.  So my task then was to

14   summarize the research on hebephilia.

15   Q.    Was that true for both the Nicholas Bauer

16   matter and the Steven Casper matter?

17   A.    Yes, each of the Illinois cases were the same

18   question.  At the time there was a state supreme

19   court decision such that where previously hebephilia

20   was assumed to be valid, it was challenged.  The

21   supreme court agreed with the challenge, which then

22   caused several Frye hearings throughout the state.

23   Q.    Next case above Nicholas Bauer is Canada versus

24   John Fitzpatrick, a sentencing hearing in Toronto.

25   What can you tell me about your testimony in that

1    matter?

2    A.    That was also a risk assessment in child porn

3    cases.

4    Q.    Above that we have re: commitment of Fernando

5    Little, also a Frye hearing.  What can you tell me

6    about your testimony in that matter?

7    A.    That was also on hebephilia, but now in a

8    different state.

9    Q.    Okay.  Re: commitment of Inger, also a Frye

10   hearing in New York?

11   A.    Same issue.

12   Q.    Hebephilia?

13   A.    Correct.

14   Q.    And then we have probate and family court

15   matters listed in Boston, Massachusetts.  What can

16   you tell me about your testimony in those matters?

17   A.    That was a custody case between two women who

18   were divorcing, and it was over the custody of

19   their -- of their child, one of whom believed that

20   the child should transition and the other who did

21   not.

22   Q.    So what was your testimony in that case?

23   A.    In fact, my testimony was summarizing what is

24   known about the outcomes of prepubescent children who

25   believe that they might be gender dysphoric and under

```
1    then arrested him, her believing that he was actually

2    trying to molest her children at the invitation of

3    this alleged mother.

4         So my testimony in that case was the science

5    of -- science known about age play.

6    Q.   Do you recall the outcome of that case?

7    A.   He was found guilty.  The case is being

8    appealed, and I think it's currently still in

9    process.

10   Q.   Have you ever offered testimony in a -- in

11   civil litigation before, or is this your first?

12   A.   I guess this would be the first.

13   Q.   Okay.

14   A.   Outside of, again, I'm not counting the divorce

15   case as civil.

16   Q.   Sure, sure.  And that's -- that's fair.  When I

17   say civil cases, functionally I'm referring to one

18   party suing another party for damages.

19   A.   Correct.  This is the only case I've testified

20   in that involved damages of any sort.  Monetary,

21   alleged monetary damages of any sort.

22   Q.   Sure.  Dr. Cantor, have you ever been arrested?

23   A.   No, I have not.

24   Q.   If we could, I'd like to go, just sort of walk

25   through generally your employment history listed on
```

1    your CV.

2    A.    Sure.

3    Q.    And I see that you received your Ph.D. in 2000,

4    so we can sort of take everything pre-2000 off the

5    table.

6    A.    Okay.

7    Q.    So let's start with your role as a psychologist

8    with the Law Mental Health Program, Center for

9    Addiction and Mental Health.  Briefly explain what

10   your role entailed there.

11   A.    I was a full-time researcher at that point.

12   Although I did have some clinical duties, and I would

13   train some students, the majority of what I did was

14   to work on research investigating various types of

15   atypical sexualities.

16         The Law and Mental Health Program is, of

17   course, their forensic program, and the great

18   majority of the situations in which my branch was

19   doing research was on sex offenders, so although my

20   background is in atypical sexualities, in general,

21   you know, within a forensic context that usually

22   involves people whose atypical sexualities led them

23   to illegal acts.

24         And so that was a laboratory where I began

25   doing research in neuroscience in order to narrow

1    down in a much more rigorous fashion what's

2    essentially the nature/nurture debate for pedophilia.

3    Is it something that people acquire over the course

4    of life, or is it something people are born by, and

5    so because there was a large number of such patients

6    going through that facility, I was able to conduct

7    a -- what are still some of the largest studies on

8    that topic.

9    Q.    Did any of your research in that role involve

10   transgender patients or gender dysphoria?

11   A.    Not directly.  It is -- it's well-known that

12   people with one atypical sexual interest often have

13   other atypical sexual interests, so some of the

14   people who had committed sexual crimes either were

15   transsexual, wondered if they were transsexual, or

16   had some other sexual interest pattern which

17   involved, for example, fantasies of being the other

18   sex, so it was secondarily involved, but it was not

19   the primary part of any of my own research projects.

20         There were occasional projects during the time,

21   because I have a background in neuroscience and

22   statistics, people, you know, who were doing that as

23   their full-time occupation sometimes would ask me to

24   consult on their projects, but my own projects were

25   primarily with sex offenders.

```
1    Q.    Okay.  And am I correct you left that -- that
2    role in December of 2011?
3    A.    I was promoted from that role to the next
4    higher rank.
5    Q.    Okay.  Which is research -- is that research
6    section head?
7    A.    That's correct.
8    Q.    And tell me briefly what that role entailed.
9    A.    My research was essentially the same.  I was
10   now continuing my research projects, but rather than
11   leading my own project, now, of course, I was also
12   helping everybody else leading their own projects.  I
13   was, you know, ultimately in charge of all of the
14   research being done inside of that unit.
15        So again, other students coming in interested
16   in other kinds of aspects, measurement, measurement
17   issues, follow-up studies, treatment studies, again
18   primarily within the forensic context, but also
19   broadly through collaborations on many different
20   kinds of sexual behaviors.
21        It was at that time that my, I'll call him
22   predecessor, Ray Blanchard, retired, so my promotion
23   was essentially to fill what his role was.  The role
24   consisted of reorganization of the department, so
25   titles often changed, even though my functional
```

1   duties were the same day-to-day.

2   Q.    And during your time as research section head,

3   did any of your research involve specifically gender

4   dysphoria or transgender medicine?

5   A.    Not in a direct way.  I would sometimes comment

6   on other literature.  I would sometimes present in

7   various academic institutions or give lectures

8   including the material, but any -- the only research

9   I did at the time, and I would have to check my CV

10  myself in order to get the timing right, but the

11  involvement that I had, as I say, was -- was

12  included, but my major programs, again my primary

13  work was with offenders, but understanding, you know,

14  any of the atypical sexualities requires essentially

15  knowing all of the atypical sexualities.

16  Q.    And when we're -- you've used term "atypical

17  sexualities."  Can you sort of expand upon that

18  generally so that I'm at least attempting to speak

19  your language as we move through this today?

20  A.    Sure.  I pick that term delicately, carefully,

21  exactly because it's such a political hotbed of an

22  issue.  For example, among the things that I studied

23  and participated as a coauthor in other people's

24  studies was the origins of sexual orientation.

25        Now, regular day -- regular everyday gay men,

1    you know, don't receive a diagnosis.  That wouldn't

2    qualify as a paraphilia and certainly wouldn't

3    receive a diagnosis, but we were still curious about

4    the nature and nurture question, what causes a

5    person's sexual orientation.  So we were

6    simultaneously investigating that.  At the same time

7    was also investigating now-diagnoseable problems such

8    as pedophilia.

9         This is, of course, not to compare the

10   situations, but if one is trying to understand, you

11   know, how the brain determines sexual interest

12   patterns, you can't study just one of them.  You have

13   to study all of them in order to try to see how the

14   various pieces put together.

15        So I say "atypical" because it's the broadest

16   term which would include people who are gender

17   variant, people with both gay, lesbian, and people

18   who pick other kind of -- other terms to describe

19   their sexual orientations, as well as the fetishes

20   and the kinks and the diagnoseable paraphilias.

21        So again, I use the term to mean broadly any --

22   to mean pretty much everything other than usual

23   everyday vanilla.

24   Q.    And you also used the term "paraphilia."  Can

25   you define that for me, please?

1   A.     All right.  A paraphilia is the technical term

2   that we -- that's used in psychiatry to describe the

3   very extremely different, unusual sexual interest

4   patterns.  Sexual interest in activities that could

5   not readily lead to reproduction, so there has to be

6   some other mechanism involved such that it would have

7   survived evolution.

8         So, you know, relatively recently, relatively

9   recently with the onset of the DSM-5, it ended the

10  word "paraphilia" being a diagnosis itself.

11        Paraphilia now just describes the interest

12  pattern, but a person would not be necessarily

13  diagnosed with a paraphilic disorder after the

14  publication of the DSM-5.

15        With the DSM-5, the person would be ascertained

16  as having the sexual interest problem, but would only

17  qualify for the formal diagnosis if they acted out on

18  it in a way that either causes them themselves

19  distress or caused harm to somebody else.

20        So I refer to the paraphilias, which would

21  include cross-dressing, exhibitionism, frotteurism,

22  voyeurism, and there are debates over, you know,

23  whether certain other sexual interest patterns count

24  as paraphilias, or they're just, you know, men

25  running amok.

1          For example, a certain type -- there are some

2     men who, for example, prefer, they're actually

3     sexually turned on by the suffering of their victims.

4     That's when we would diagnose sexual sadism, but we

5     have to be careful so as not to accidentally diagnose

6     somebody who is just kinky and into S&M and would

7     only do that to a consenting partner.

8          So if that, again, would be the difference

9     between a paraphilia and a paraphilic disorder.

10    Q.    Okay.  And then am I understanding your

11    testimony correctly that gender dysphoria is

12    considered a sexual interest activity or pattern?

13    A.    That's a bit of a debate, and people --

14    different people in different situations will define

15    terms in ways which can sometimes leave overlap and

16    sometimes exclude overlap, so it usually depends on

17    the context.

18         Under -- there's also a debate still going on

19    about to what extent some of the people who want to

20    change genders want to change genders exactly because

21    of a sexual interest pattern, making any distinction

22    between them relatively moot.

23         For example, one of the DSM categories is

24    transvestic fetishism.  These are people -- these are

25    practically always biological men, biological males

1    sometimes simply for political or PR reasons.

2    Q.    All right.  I appreciate all of that.  So

3    getting back to your -- the positions listed on your

4    CV.

5    A.    Yeah.

6    Q.    Looks like you received another promotion from

7    research section head to head of research.

8    A.    That is -- as I say, some of these titles were

9    just changing because of reorganizations of the

10   department, merging of department that had different

11   title changes, so some were -- so there was one

12   primary promotion, and the others were, as I say,

13   changes in title.

14   Q.    And so head of research, your day-to-day job

15   duties and responsibilities, was that functionally

16   the same as research section head?

17   A.    That's correct.

18   Q.    And during your role as head of research, did

19   you, you personally, do research in the field of

20   transgender or gender dysphoria?

21   A.    Again, it was included in that.  I participated

22   broadly mainly through collaborations with other

23   people in the gender clinics of the hospital where I

24   was for the research that they were doing.

25        So I was in charge of my own research, again

23

1    primarily on forensic issues, and I was

2    participating, contributing, involved with the

3    research of other departments, even though I wasn't

4    the principal investigator of those other projects --

5    although I wasn't always the principal investigator

6    of those other projects.

7    Q.    And then senior scientist, is this another one

8    of those reorganization role changes?

9    A.    Correct.  When I was a psychologist I was a

10   member of the union in that hospital.  Once I was

11   promoted to an administrative role, I wasn't -- I

12   wasn't allowed any longer to be in the union, so they

13   had to give me a new title, and so that was the title

14   they gave me.

15   Q.    And then I think above that we have director of

16   the Toronto Sexuality Center.  Is that a position you

17   hold currently?

18   A.    That's correct, I left CAMH in 2018.

19   Q.    And was that to take over the role, the

20   director role at Toronto Sexuality Center?

21   A.    Not in order to.  Really I was becoming

22   increasingly uncomfortable with what was going --

23   with what was going on in other sections of the

24   forensic department that I was related to, but not

25   closely.

24

1          Now, in Canada, of course, we have a public

2     healthcare system, but there are some functions that

3     some of the psychiatrists performed which were still

4     private.

5          What was going on for the private cases, where

6     a lot of these people were getting most of their

7     income, was really starting to encroach in increasing

8     ways on what was actually supposed to be public

9     functions.

10          I started to contest that and point that out

11     with the administration, and with the pushback I was

12     getting, ultimately I decided I didn't want any part

13     of this.  This was unethical.

14          So I left the hospital, and I created my own

15     clinic where I'm now pretty much 50/50 research

16     consultation versus clinical work, and now I have a

17     staff of clinical psychologists working underneath

18     me.

19     Q.    And so your -- you drew a division between

20     research and clinical work.  Can you sort of explain

21     the difference between those two roles?

22     A.    It's actually easier to explain that now than

23     when I used to be at the hospital.  At the hospital

24     the research was, you know, on the -- on the clinical

25     patients we were seeing, so one turned into the

MCLENDON-KOGUT REPORTING SERVICE, LLC  (502) 585-5634

1    other.

2         If you see one patient, it's clinical.  If you

3    see a hundred, now it's research.  I could do a file

4    review, and they can say whatever percent receive

5    whatever characteristics.

6         The private clinic where I am now is I'll

7    call -- is, fair to say, a much more traditional

8    psychotherapy clinic.  These are people with now a

9    very, very broad range of clinical problems ranging

10   from sexual dysfunctions such as premature

11   ejaculation and lack of orgasm, includes the

12   paraphilias and kinks, people trying to deal with

13   coming out as gay, includes, of course, people

14   considering transition, undergoing transition, or

15   sometimes deciding to detransition, plus a lot of

16   couples therapy.

17        And then the part that's research and

18   consultation includes functions such as today, plus

19   evaluating other research and performing now more

20   theoretical contributions to the scientific

21   literature instead of direct data collection.

22   Q.    And you talk about theoretical contributions to

23   the scientific literature.  Can you expand upon that?

24   A.    Sure.

25   Q.    What does -- what does that entail?

1   A.    Sex research, even more than other branches of

2   research, contain many debates and there are many

3   issues, you know, of interest to the public and of

4   interest to scientists.

5         Now, when people make a claim that, you know,

6   some fact is true, very often there are some papers

7   that say yes, some papers that say no, and some

8   papers that are a little bit ambiguous.  So a lot of

9   what I do is analyze the analyses, you know.  I point

10  out even methodological strengths or methodological

11  weaknesses or I point out various patterns that occur

12  that would make one hypothesis or a series of

13  hypotheses more parsimonious or better explanations

14  for the observations.

15        So it's -- some people would use the word "meta

16  analytic."  In fact, in science there's even formally

17  a term for "meta analysis" where we analyze the

18  analyses themselves in order to come up with big

19  bottom-line answers to what an entire literature is

20  looking at.  So I'm performing -- so I do more tasks

21  like such as that.

22  Q.    Okay.  And how much of your research involves

23  gender dysphoria and transgender patients?

24  A.    As I say, it's a little tough to estimate

25  because these overlap.  For example, one of the --

1    one of the papers I published was to develop a new

2    statistic, a statistical technique that would help us

3    analyze, you know, the likelihood by which various

4    factors would influence a person's sexual

5    orientation, but that exact same statistic then

6    pertains to exactly the same situation for a certain

7    kind of transsexual, even though it doesn't pertain

8    to all kinds of transsexuals.

9         So the information is relevant, the information

10   spans them, the people that it involved includes

11   them, but it -- but I haven't done the kind of

12   research where I took a sample of trans people, put

13   them through some kind of treatment or created some

14   kind of a control group in order to compare the two.

15   So usually I'm doing research pertinent to and

16   involving trans issues, but only a small proportion.

17        And again, for some of the early ones I'd have

18   to look through my own list to check, but as a

19   proportion it would be -- of directly trans-related

20   research would be relatively small, 10, 15 percent,

21   but of the rest of the research pertinent to

22   transsexualism, probably closer to 30, 40 percent.

23   Q.    And I think throughout the day I've used the

24   term "transgender."  I think you have used the term

25   "transsexual" and possibly "transgender."  Is there a

29

1          So I will often refer, use the word

2     "transsexual" when I'm referring to the research and

3     actual people who have gone through, you know,

4     whatever procedures and we're looking at the outcomes

5     of them, and I will often use the word "transgender"

6     to refer to the broader community who refer to

7     themselves as transgender -- who refer to themselves

8     as transgender, even though I wouldn't refer to them

9     as transsexual.

10    Q.    Okay.  All right.  I think I understand the

11    distinction you're drawing, and I appreciate the

12    clarification on that.

13          We've talked a little bit about your research

14    at Toronto Sexuality Center.

15          Clinically, is there a percentage of patient --

16    strike that.

17          Can you estimate a percentage of patients you

18    see for issues involving gender dysphoria,

19    transgender issues, or transsexual issues?

20    A.    Probably about 5 to 10 percent.

21    Q.    And then I'd like to talk briefly about your

22    academic appointments listed on your CV.  And again,

23    if we can start at the bottom and just work our way

24    up.  Can you still see what's displayed on the

25    screen?

1    A.    Yes.

2    Q.    All right.  So let's talk briefly about your

3    role as adjunct faculty at St. Joseph's Healthcare.

4    What can you tell me about that role?

5    A.    I received that title because I was supervising

6    some of their students, so that gave me the faculty

7    association with their department.

8    Q.    Was that just supervising research?

9    A.    That was clinical supervision.

10   Q.    Okay.

11   A.    And training, I should say.

12   Q.    Sure.  So clinical supervision and sort of

13   real-world training as you're supervising students or

14   residents?

15   A.    As I say, our department saw patients, and then

16   we did research on the large numbers of patients that

17   we saw, so the clinical training I provided was then

18   doctorate-level students studying for their Ph.D. in

19   clinical psychology, training them to perform the

20   clinical duties with the same -- with those same

21   people, or with our populations.

22   Q.    Sure.  And then what about your role as

23   assistant professor at University of Toronto?

24   A.    Medical schools don't treat faculty positions

25   the same way that art and science-based colleges and

1   universities do.

2   Q.    I was curious if that's the case in Canada as

3   well as the United States.

4   A.    Yes, it's very much the same.  So I had

5   university appointments, I had university

6   recognition, I had university titles and so on, but

7   they didn't pay any of my salary.

8         I didn't report to anybody at the university.

9   I had a title from them in recognition of the work --

10  of the work I did at our teaching hospital, which was

11  a teaching hospital of that university.

12  Q.    Was that CAMH?

13  A.    Correct.

14  Q.    Okay.  And then I see on here associate

15  faculty.  I'm assuming that's an honorific at

16  University of new England?

17  A.    Correct, I was supervising a student there, and

18  so that was the association they granted me.

19  Q.    Okay.  Then adjunct faculty at York University.

20  What was -- what did that role entail?

21  A.    Same, I was supervising the dissertation of a

22  doctoral student there.

23  Q.    Do you recall what that dissertation was about?

24  A.    I will in a minute.  She was using brain scans

25  to compare two different populations -- oh, sex

1  addicts versus nonaddicts.

2  Q.    Okay.  And then last appointment you have is

3  associate professor, also at University of Toronto.

4  Was this just sort of a continuation of your role

5  supervising students conducting research?

6  A.    Exactly.  Once somebody reaches a certain level

7  of productivity, and I need a better word than

8  notoriety, of productivity and establishment within

9  the literature, then one receives the equivalent of a

10  promotion in title.

11  Q.    And are you still affiliated -- are you

12  still -- one more time.  Do you still have any

13  appointment with University of Toronto?

14  A.    No, I essentially gave those up when I left

15  CAMH.

16  Q.    Okay.  During your roles at University of

17  Toronto, York, and your other academic appointments,

18  did you ever have any sort of administrative

19  appointments with any of those universities?

20  A.    No.

21  Q.    And this should be self-evident, but I'm going

22  to ask anyway just to make sure.  Have you ever had

23  any involvement with the University of Louisville?

24  A.    No.

25  Q.    Stop screen sharing for a minute.

33

1          Dr. Cantor, did you review any materials

2     concerning Dr. Josephson's separation from the

3     University of Louisville?

4     A.    No.  No, I did not.  I only reviewed the

5     transcripts that we mentioned earlier.

6     Q.    All right.  Have you spoke with Dr. Josephson

7     about the subject matter of this lawsuit?

8     A.    We had a conversation together with the

9     lawyers, yes.

10    Q.    Do you recall when that was?

11    A.    Oh, I think it was in March.  I would have to

12    check my notes.

13    Q.    Do you recall how long that conversation

14    lasted?

15    A.    Roughly an hour.  My memory of it is pretty

16    vague.

17    Q.    To your knowledge, have you ever seen the

18    amended complaint that was filed in this lawsuit?

19    A.    The complaint itself, no, I don't think I have.

20    Q.    And again, I probably know the answer to this,

21    but I'm just going to ask to make sure.  In

22    connection with your opinions and your work on this

23    case, have you spoken with any faculty or

24    administrators at University of Louisville?

25    A.    No.

1    myself actually.  I was trying to think of -- my

2    partner is also a psychologist, and I often give him

3    documents to ask his proofreading of, but I didn't on

4    this one.

5    Q.    If we look at paragraph 10 of this report, you

6    talk about some of the peer-reviewed literature that

7    you reviewed, as well as some of the guidelines from

8    various organizations concerning transgender or

9    transsexual medicine and gender dysphoria, correct?

10   A.    I'm sorry, say that again?

11   Q.    Paragraph 10 of your report you discuss some of

12   the peer-reviewed research literature that you've

13   reviewed, as well as guidelines or recommendations

14   from various clinical groups, correct?

15   A.    Yes, that's right.

16   Q.    Okay.  We'll talk about the Dutch Approach here

17   in just a minute, but let's walk through some of

18   these others.  The World Professional Association of

19   Transgender Health, what is that organization?

20   A.    It's gone through some relatively recent

21   revisions.  It was started several decades ago as a

22   small organization of the few clinicians who were,

23   you know, who were seeing patients who were coming

24   into clinics asking for transsexual medical services.

25   They wanted to transition.

MCLENDON-KOGUT REPORTING SERVICE, LLC  (502) 585-5634

1          Very, very, practically nothing was known, you

2     know, through the -- until the '60s and '70s, 1960s

3     and '70s, and so the group then founded by Harry

4     Benjamin, I think it was, and it was called the Harry

5     Benjamin Gender -- Harry Benjamin Gender Dysphoria

6     Association, I think was one of its original names,

7     which was essentially a gathering of the clinicians

8     and of the researchers to try to figure out what was

9     going on and what the best thing to do was when we

10    knew, quite literally, nothing.

11         That group started growing over time, and more

12    and more attendees started to be the actual people

13    who wanted such services and other clinicians who

14    themselves were transsexual or transgender.

15         The group went through a relatively recent

16    reorganization and renaming, and there's been a bit

17    of a switch to it where it was a -- an organization

18    of the people who were providing clinical services or

19    doing research on it, they renamed itself and

20    recentered itself essentially on the people who were

21    receiving the services.

22         Although it refers itself now to professional

23    association, it's a rather underhanded use of the

24    word "professional."  There's no long --

25    Q.    What do you mean by that?

38

```
 1   A.     It no longer necessarily means licensed

 2   psychologists and licensed psychiatrists and licensed

 3   surgeons anymore.  Now it also includes people who

 4   were providing professionally the cosmetic services

 5   to transsexuals, so it's not really any longer about

 6   the, you know, clinical outcomes resolving

 7   depressions or dysphoria, it also includes, as I say,

 8   professionals who were involved in -- in nonmedical

 9   and nonclinical means.

10        So where professional used to be assumed to be

11   clinical professional, now it's any professional.

12   Q.     And, to your knowledge, are the WPATH

13   guidelines binding on doctors, clinicians, or are

14   these just strictly sort of guidelines,

15   recommendations?

16   A.     They're guidelines and recommendations.

17   Q.     All right.  Next is The American Academy of

18   Child & Adolescent Psychiatry.  What can you tell me

19   about that organization?

20   A.     That now is a -- what we would more sincerely

21   call a professional association, and, you know, much

22   more specific.  These are specifically of

23   psychiatrists who are, of course, physicians, and

24   they are child psychiatrists.

25        These are the people who work, you know, with
```

1    the younger end of people who feel gender dysphoric.

2    They are a legitimate clinical association.

3    Q.    And again, those guidelines are strictly

4    guidelines, recommendations?

5    A.    Yes.    I don't believe they've put out anything

6    binding.

7    Q.    And then you also note the guidelines, I'm

8    assuming they're guidelines, issued by the American

9    Association of Pediatrics.    What is the American

10   Association of Pediatrics?

11   A.    They are now a very, very large and very

12   well-established group of medical professionals,

13   pediatricians, and they are -- as I say, they are

14   large and well-established, and whether the policies

15   they put out are based on science or not is really

16   just an issue that one needs to take on -- one needs

17   to take issue by issue.

18        They recently put out a rather dramatically

19   worded series of guidelines claiming that it was

20   about research, but any basic fact checking, and I

21   published a thorough fact checking --

22   Q.    I read your thorough fact checking.

23   A.    And, so even though they've made very many

24   claims about what they think the guidelines should

25   be, the basis of those claims were simply

40

1    demonstrably false over and over again.

2         They made no response whatsoever to my

3    identification of these errors, you know, and

4    reporters have gone to them asking specifically,

5    "What is your response to this," and they just said,

6    "We have nobody available to comment."

7    Q.    And again, the AAP guidelines that you take

8    issue with, those are also nonbinding, strictly a set

9    of recommendations or guidelines from this

10   organization?

11   A.    Correct.

12   Q.    Other than -- well, let me ask you this:

13   Since -- since you wrote this report at the end of

14   March of 2021, are you aware of any additional

15   guidelines from any sort of professional or,

16   quote/unquote, professional organizations concerning

17   gender dysphoria, transgender, or transsexual

18   patients?

19   A.    There are two I'm aware of.  One is from the

20   American Psychological Association, and one is from a

21   group largely led by the American Psychological

22   Association.  It's really a consortium that includes

23   the American Psychological Association and some other

24   associations.

25         In both of those statements they make

1    relatively general, relatively broad statements of

2    support, but again, without -- without much, if any,

3    scientific foundation to them.  They're usually --

4    the APA one was an offhanded -- I shouldn't say

5    offhanded, was a vaguely-worded expression of support

6    for what they think should happen, but without any

7    specifics -- without any specifics.

8          The other one that I'm aware of came out came

9    out last week from a new group.  Their full name

10   escapes me, but the abbreviation of it is CAAPS.

11   That one included absolutely no scientific references

12   whatsoever.  They merely declared that they believed

13   what is often being called rapid-onset gender

14   dysphoria doesn't exist.  They simply said that

15   there's no science behind it.

16         There were no citations in that report, they

17   gave no indications of what kind of science they

18   would like to see before endorsing it, and I am at

19   the moment preparing a comment on their comment.

20   Q.    And so without having read these myself, the

21   APA guidelines, are those also just strictly

22   recommendations, guidelines, here's what we think,

23   similar to the WPATH and the AACAP and AAP?

24   A.    I have to unpack that a bit.

25   Q.    Let me -- let me ask it a different way, see if

 1    I can help.

 2    A.    It's just in pieces.  It indeed was -- I'm

 3    sorry, go ahead.

 4    Q.    Oh, I was going to say, the APA guidelines,

 5    again, are those just strictly guidelines,

 6    recommendations similar to what we've talked about

 7    with these other organizations, sort of recommended

 8    approaches?

 9    A.    I think you meant APA, but yes.

10    Q.    Did I misspeak?

11    A.    You said AAP, and it's really easy to do.

12    Q.    Well, thanks for helping me out on that one.

13          And the same is also true with the CAAPS

14    guidelines, those are just strictly here's what we as

15    an organization think should happen, they're not

16    binding on clinicians or otherwise?

17    A.    It was even more vague.  It included no

18    scientific references whatsoever, and it was a very

19    short three paragraph series of claims.

20    Q.    And again, without having seen either of these

21    guidelines, would the APA guidelines and the CAAPS

22    guidelines, would those be similar to the AAP

23    guidelines in terms of "Here's what we'd like to see

24    generally," and you take issue with the underlying

25    science?

1    A.    Both of them were much more vague than what was

2    in AAP, and to the extent that they referred to

3    anything verifiable, it doesn't match up closely

4    with -- with the science.

5         To the extent that it's expressing, you know,

6    philosophies, one is entitled to a philosophy, but to

7    the extent that it relies on anything factual, the

8    alleged facts are more -- are not only questionable,

9    there's a great deal of evidence pointing in the

10   opposite direction.

11   Q.    To your knowledge, do any clinicians rely on

12   the AAP, APA, or CAAPS guidelines in addition to the

13   WPATH and AACAP?

14        MR. LANGHOFER:  Objection, calls for

15   speculation.

16   Q.    You can answer.

17        MR. LANGHOFER:  You can answer if you know.

18   A.    I don't think there are many who use it, but

19   because the issue has become so fraught that few

20   people are really talking about exactly what it is

21   that they're doing because everybody is being afraid

22   of being shot by one side or the other.  So people

23   will often make claims that they're following one or

24   the other, and they're not.

25   Q.    "One or the other" meaning --

44

1    A.    Whatever given set of guidelines.  Whatever --

2    essentially, people are using these guidelines to

3    cover their reputations, but whether that actually

4    describes what they're doing is -- is very

5    questionable.

6    Q.    Sure.  And let's -- let's talk just briefly

7    about the AAP guidelines.  What -- how do those

8    differ from the WPATH's guidelines?

9    A.    I think we're slipping a bit in how we're using

10   the word "guidelines."

11   Q.    Okay.

12   A.    AAP didn't exactly say what to do, over broadly

13   stating it, do whatever the patients asks you to do.

14   That's unlike the Dutch Approach, which you said we

15   will talk about, or the WPATH standards, which give

16   much more specifics about when, under what

17   conditions, who might be, and who should be ruled out

18   of consideration from transition.

19        The -- many of the other statements -- many of

20   the statements provide only broad support that people

21   deserve rights, people deserve consideration, that

22   transsexuality is a genuine phenomenon that needs to

23   be taken seriously, but don't say anything as

24   specific "at age 12 you may begin whoever procedure."

25   Q.    And so would it be fair to say that the AAP

45

1   guidelines are more philosophical or aspirational

2   than some of what's included in the WPATH guidelines?

3   A.    That would be fair.

4   Q.    Scroll down to paragraph 11 of your report.

5   You write, "It is not possible to assess

6   Dr. Josephson's comments relative to a consensus of

7   my field, however.  No such consensus is discernible.

8   The current situation remains today as described by

9   Dr. Rosalia Costa of the widely cited gender clinic

10  at the Tavistock Centre in the United Kingdom."

11        And then you quote some of her language that

12  functionally, as I read it, has said that some

13  practitioners agree with the Dutch Approach and

14  others believe they have an obligation to help a

15  patient sort of if there's any way they can.

16        Is that -- is that a fair characterization of

17  these two general approaches?

18  A.    Yes.

19  Q.    When you say there's no discernible consensus

20  in your field, what are you referring to there?

21  A.    There's never been a survey, and because it has

22  become so politically fraught, and with everybody

23  really making declarations and actions, and all we're

24  seeing is essentially what's appearing on social

25  media, but behind closed doors in private

1    conversations and back-channel emails and discussion

2    after discussion after discussion, I keep hearing,

3    and I imagine other clinicians keep hearing that what

4    people are saying out loud, or what we're hearing in

5    the public conversation is not really resembling the

6    murmurs that clinicians are willing to talk about

7    when nobody is listening.

8         Now, of course, there is no way that I can say

9    that my personal experiences are a meaningful

10   cross-section of this population, and neither can

11   anybody else.  We simply have what's being reported

12   in the media and social media, and there's no way to

13   know how well they represent exactly whom.

14   Q.    And so am I correct, then, that sort of from a

15   clinical standpoint there's different conclusions

16   about the best way to handle treatment and transition

17   or not transitioning with transsexual patients?

18   A.    I would divide that a bit.  The science

19   indicates that there are different kinds of

20   transsexual patients who are best served by different

21   kinds of treatments, yet there are people who don't

22   believe in, for example, gatekeeping or screening at

23   all, and they're advocating simply giving clients

24   whatever it is that the client demands, especially if

25   the client makes very emotional pleas for it.

1        So there were people claiming that that -- that

2   one should provide the client with whatever the

3   client wants, but they're not providing any science

4   to demonstrate that that's effective.  So we have

5   scientists and empirically-based clinicians just

6   pointing out what the evidence is, and therefore what

7   the logical conclusion is, and to other people to

8   whom they feel the science is irrelevant, that they

9   believe doing for these people what these people ask

10  is the right thing to do, and therefore challenge

11  whatever science they need to challenge, even when

12  it's not merited.

13  Q.    Are those clinicians?

14  A.    I've -- it includes clinicians.  It includes

15  clinicians, activists, members of the public.  I

16  would not -- it certainly includes clinicians, but I

17  would also certainly not limit it to clinicians.

18  Q.    Sure.  And then let's -- now -- now is I

19  suppose as good a time as any to talk about the Dutch

20  Approach, and I've read your report, so I don't think

21  we need to look at what you've written in painstaking

22  detail, but just briefly what is -- what is the Dutch

23  study and the Dutch Approach?

24  A.    The Netherlands has a relatively or had a

25  relatively novel healthcare situation which enabled

1    now handling this gatekeeping role?

2    A.    It's very, very tough to tell.  A person can

3    say that they are ruling out people with mental

4    illnesses, but very many of these reports

5    circulating, people are saying, oh, that's very rare,

6    oh, that happens in one or two percent of the cases,

7    despite that the objective research, the people

8    actually doing file reviews of everybody who comes

9    through the clinic are finding very, very substantial

10   proportions of people with substantial mental

11   illnesses or issues they need to resolve.

12        Among the children, the reports are saying over

13   50 percent are -- of these kids have significant

14   diagnoseable-level anxiety disorders or depressions.

15   So it's not so clear that even though people will say

16   that they are performing the gatekeeping role,

17   there's not -- there's no small amount of suggestion

18   that they're doing it in word only.

19   Q.    Is that getting back to what Dr. Costa alluded

20   to, other healthcare professionals arguing they have

21   an obligation to alleviate suffering?

22        MR. LANGHOFER:  Objection, calls for

23   speculation.

24   Q.    Would that be, what you're describing, is that

25   consistent with what Dr. Costa refers to or addresses

1  Dr. Josephson's panel remarks regarding unresolved

2  issues of abuse as a potential confound."

3      Correct?

4  A.    Yes.

5  Q.    And am I correct, Doctor, that your opinion in

6  this case is that Dr. Josephson's statements during

7  this October 2017 presentation at The Heritage

8  Foundation are consistent with the state of the

9  science as it existed at that time?

10  A.    Yes.

11  Q.    Is it your opinion that those statements are

12  consistent with the guidelines from various

13  organizations, professional or, quote/unquote,

14  professional concerning gender dysphoria and

15  transsexual medicine?

16  A.    Yes.

17  Q.    Were Dr. Josephson's statements or comments

18  during this presentation consistent with how

19  practitioners were treating patients with issues of

20  gender dysphoria in October of 2017?

21      MR. LANGHOFER:   Objection, calls for

22  speculation.

23  Q.    You can answer.

24  A.    I have no way to know, especially in this kind

25  of a situation where there is so much pressure on

1    people not to reveal what they're doing because

2    they're afraid of getting shot at by one side or

3    another.

4         People aren't really talking about what it is

5    that they're doing, or they're misrepresenting what

6    it is that they're doing, so it's really tough to

7    tell what clinicians are actually doing versus the

8    ones who, you know, anoint themselves leaders and

9    declare what they think everybody should be doing.

10        How many are actually doing it versus saying

11   it, there's no way to know, and the input that I do

12   get is that it's murky, and people are hiding what

13   they're doing out of sheer fear of cancellation or

14   other pressures.

15   Q.    And is this part of why there's no real

16   clinical consensus on how to treat children with

17   gender dysphoria issues from a clinical standpoint,

18   as you note?

19   A.    That's correct.  I phrased it in my report

20   carefully.  No discernible consensus.  There's just

21   no way to know.  There's no survey, there's no -- I'm

22   guessing.  Anybody else would be guessing, and in

23   politically hotbed issues, I am much more sceptical

24   of anybody who says anything, or anybody that makes

25   claims about whatever it is they say they're doing.

1   Q.    Was there anything that Dr. Josephson said

2   during his presentation that was inconsistent with

3   the state of the science in October of 2017?

4   A.    No.

5   Q.    Doctor, is it possible that someone with

6   similar background and education as you could view

7   Dr. Josephson's presentation and reach different

8   conclusions than what you've reached?

9         MR. LANGHOFER:  Go ahead, sorry.  Let me -- go

10  ahead and finish.  I interrupted you, Matt.  I'm

11  sorry.

12        MR. BARSZCZ:  No, you interrupted me at the end

13  of the question.

14        MR. LANGHOFER:  Okay.  It calls for

15  speculation.

16  Q.    Answer it if you can, sir.

17  A.    The part I'm getting stuck on would be somebody

18  with the equivalent education or knowledge I do,

19  because if -- so many of the speakers on this topic

20  are so strongly politically motivated, and it does

21  include people who have the information and education

22  that I do, but they take the same material and are

23  biased by their political or other views when they

24  are reviewing and examining it.

25        So I wouldn't be surprised, and I probably have

MCLENDON-KOGUT REPORTING SERVICE, LLC  (502) 585-5634

1   encountered people with the same level of, you know,

2   objective education that I have, but come to an

3   opposing conclusion.

4        If this happens on social media we end up in a

5   debate, and I keep ending up with the same

6   circumstances over and over again.  I point out

7   exactly which study justifies whatever it is that I

8   say, and then the other person disappears.

9        It's like AAP has, you know, people and experts

10  and so on who have educations, you know, that one

11  would think, or that they would declare to be like

12  mine, but they keep getting the information wrong.  I

13  show that it's wrong, and I have no response for it.

14  So I'm -- I guess I'm saying I'm not really sure how

15  to answer that question.

16  Q.   We talked about the lack of a discernible

17  consensus regarding treatment in this field.  Given

18  that lack of discernible consensus, could another

19  doctor or clinician who studies, practices, treats

20  patients in this area take issue with Dr. Josephson's

21  comments from -- at The Heritage Foundation in

22  October of 2017?

23       MR. LANGHOFER:  Objection, calls for

24  speculation.

25       You can answer if you know.

1    A.    Could you ask that one more time?

2          MR. BARSZCZ:  Jenny, can you read that back,

3    please?

4          (The Reporter read the requested material.)

5          MR. LANGHOFER:  Same objection.

6    A.    The part I think I need to unpack is "studies,

7    treats, and practices."  If they study it, which I

8    take to mean in an objective, scientific way, no such

9    person could take issue with what Dr. Josephson said.

10         If it's practices, many people are following

11   what they believe to be the practices, and it depends

12   on the information sources that they have exposed

13   themself to.

14         If they are a kind of person or -- who believes

15   that he or she is providing client-centered care by

16   providing the client or patient whatever they ask

17   for, that kind of person I can easily imagine would

18   contest what Dr. Josephson says, but not anyone --

19   there might be people who call themselves

20   evidence-based who would contest it, but nobody could

21   produce the actual evidence.

22         Actual evidence-based people would immediately

23   agree and would not be able to contest what

24   Dr. Josephson said.

25   Q.    And can you talk a bit about the methodology

1    that you employed in reaching your opinions

2    concerning Dr. Josephson's presentation at The

3    Heritage Foundation?

4    A.    Unless you mean something specific, it was

5    really just a comparison of what he said and what the

6    scientific literature says about rates, about, for

7    example, the comorbid rates of mental health and so

8    on.

9    Q.    And that's really what I'm getting at is

10   functionally, you know, unpacking what -- what you

11   did to arrive at your opinions for this case.

12   A.    Oh.  My -- let me divide that a different way.

13   How I see, you know, the scientific literature has

14   been building since I've been reading the scientific

15   literature and as I have been watching the scientific

16   literature grow over the past 20 years.

17         So whenever I hear, and it's not just

18   Dr. Josephson, many people are giving many different

19   talks in many different contexts, and I'm just

20   listening, and so as I'm hearing whatever claims,

21   they naturally are just getting compared to what I

22   happen to know.

23         Is there something here that's news, is there a

24   perspective that I'm missing, or is there a

25   perspective or fact or entire literature that this

MCLENDON-KOGUT REPORTING SERVICE, LLC   (502) 585-5634

1    other person is missing.

2        So just as a scientist listening to scientific

3    claims in my field, you know, my brain, like anybody

4    else, is just automatically evaluating or comparing

5    what it is I'm hearing with what I already know.

6        So any -- the only other process I did, other

7    than that, was to look up the specifics and

8    double-check that there's not anything that I'm

9    accidentally missing or seeing if there was some

10    exception that I should be aware of so that I

11    oughtn't say, you know, the most extreme terms

12    available to me.  I shouldn't say "all" or "always"

13    rather than "most" or "usually."

14        So that that -- if I'm understanding what you

15    mean by process, that was essentially my process.

16    Q.    Okay.  I think we're speaking the same

17    language.

18        MR. BARSZCZ:  If I can maybe take five minutes

19    and just go through my notes.  I might be about

20    finished.

21        MR. LANGHOFER:  Okay.

22        VIDEOGRAPHER:  We're going off the record.  The

23    time is 12:58 p.m.

24        (Recess from 12:58 p.m. to 1:01 p.m.)

25        VIDEOGRAPHER:  We're going back on the record.