# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| ALLAN M. JOSEPHSON, Plaintiff | Case No.: 3:19-CV-230-RGJ-CHL |
| v. | |
| NEELI BENDAPUDI, ET AL. Defendants | |

* * *

The deposition of ALLAN MARK JOSEPHSON, M.D., taken pursuant to notice via videoconference by the Defendants on March 17, 2021, during the Kentucky Coronavirus State of Emergency with participants located at the addresses listed on the appearances page.

TRACY P. LUNDERGAN, RMR, KY CCR
McLendon-Kogut Reporting Service, LLC
Anchorage Office Plaza
2525 Nelson Miller Parkway, Suite 204
Louisville, Kentucky 40223
(502) 585-5634
tlundergan@mclendon-kogut.com
www.mclendon-kogut.com

psychiatry knew me from my national work, and so those kind of introductions had -- had taken place, then when I knew the specifics of the job, I sent in my CV and the application process began.

Q. Okay. And there were some recommendation letters that accompanied your -- your application process; is that right?

A. Yes.

Q. And some of those, if not all of those, have been provided in discovery in this case; is that correct?

A. I believe so.

Q. Okay. Did you come in as the -- as the division chief in January of 2003?

A. Yes.

Q. And in those days the division, was -- was it part of the -- a different department, Department of Psychiatry as opposed to pediatrics; is that right?

A. That's correct.

Q. Okay. What did the -- when -- when you started, what did the division chief role entail to your recollection?

A. Well, pretty much what it did at the end of my career. Administrated the division, meaning recruited new faculty, monitored their development,

monitored their clinical as well as academic projects, and was responsible for the business operations of the division, represented the division at national meetings and conferences, and tried to be the face of child psychiatry at the University of Louisville.

Q. Okay. What do you mean by the face of child psychiatry at the University of Louisville? What -- can you elaborate on that?

A. Well, in -- in national meetings, for example, I would go and represent Louisville, meet leaders in other medical schools, tell them what was going on with us, and try to encourage others to think of Louisville as a good place to work.

Q. Okay. Was -- was it always part of the division chief job in your time at the university to -- to be the sort of public face of the division and -- and project that goodwill to the larger region and nation?

A. Yes.

Q. Okay. Am I correct that at no point in time in your time at the University of Louisville did you have tenure; is that right?

A. That's correct.

Q. Okay. What -- was it always a system of

began to recruit and our training program grew, so people knew more about Louisville than they had previously.

Q. Okay. You have -- you've -- you've alleged that while you were division chief, you gave 19 invited lectures, 57 presentations to national or international groups, and 12 presentations to regional groups. Does that sound accurate?

A. Yes.

Q. What kind --

A. That sounds right.

Q. Okay. I want to unpack that a little bit and -- and just understand what we're talking about. The invited lectures, what -- what is that?

A. Well, that's when another university would look at my work and want to hear of it in their program, then I would go speak, for example, at the University of Colorado, University of Kentucky, places like that, Brown University, Harvard University, and they wanted to hear of my expertise, and then I would teach usually the Department of Psychiatry, the Division of Child and Adolescent Psychiatry.

Those are different presentations than ones where I would submit my work, it would be evaluated

by a committee of psychiatrists, and if it was deemed worthy, then I would present there at the -- for example, the annual meeting of the American Psychiatric Association, the annual meeting of the American Academy of Child and Adolescent Psychiatry, and in doing those things, then you identify, of course, your institution and spread the good news about University of Louisville.

Q. All right. So we -- we've talked about the invited lectures. What is different, if anything, about the -- the presentations to national or inter -- international groups?

A. In some cases not too much difference. It would be similar topics because, of course, there are only a certain number of things that I studied and -- and wrote about, so there are a lot of similarities, but then some of the meetings, for example, the American Aca -- or the Directors of Child and Adolescent Psychiatry meeting, some of those presentations had to do with administration, leadership and those types of things.

Q. Okay. And then the -- the 12 presentations to regional groups, is that sort of the same flavor as the -- the national and international programs, etcetera?

A. Somewhat some of the same -- same flavor, that's correct. That would include probably essentially region, Kentucky, Louisville and the surroundings.
Q. Now, in your -- your original verified complaint you attached an exhibit. I'm looking at it right now. It's called Highlights of Dr. Josephson's Tenure as Division Chief that outlines some of the things we've been talking about in terms of national, regional, etcetera, presentations and lectures. Are you familiar with that document?
A. Yes, I am. It's been a while since I've looked at it, but --
Q. Okay. Is -- is that a document that you prepared?
A. I think so, yes.
Q. To -- to the best of your present knowledge, is that document accurate and true?
A. Yes.
Q. Okay. The -- the idea of presentations, whether it's guest lectures or national or international presentations or regional presentations, is that something that is part of the job as division chief in your view?

A. Yes.
Q. Okay. And, in fact, in your annual evaluations in your role as division chief, part of what you were, for lack of a better word, judged on was your engagement in these types of lectures and presentations; is that fair to say?
A. Yes.
Q. Okay. The -- there's an allegation in this lawsuit about a Heritage Foundation panel discussion that took place at some point in the fall of 2017. You know what I'm referring to, correct?
A. Yes.
Q. How does that panel presentation fit into the panoply of national presentations and lectures that we've been talking about or does it?
A. Well, I think it does more -- more like those things than not. It's an invited lecture.
Q. Okay. How did that in -- invitation come about with the Heritage Foundation?
A. I got a call from the -- the coordinator, whose name was Ryan Anderson, and he invited me to speak on the topic.
Q. And you -- you accepted, obviously, right?
A. Yes. Yeah.
Q. And the -- the -- the panel presentation

defendants' attorneys, and I was surprised at that, had some concern because of involving the fac -- whole faculty on the campus was a -- was a big deal.

So I was notified that when I was attending our annual meeting, which was held in the end of October in Washington D.C., and as soon as I got back to Louisville, as soon as it was possible, I -- I scheduled a meeting with Chairman Charles Woods of the Department of Pediatrics and informed him that I had gotten this notice from the attorney in -- in this case and that several faculty would be receiving a subpoena. It was more of an FYI meeting.

Q. Okay.

A. And that was in the first week of November.

Q. Okay. That's what I was going to ask. So early November time frame.

A. Yes.

Q. Okay. So -- so what happens next after you have this meeting with -- with Dr. Woods?

Well, let -- let -- not -- not after, but tell -- tell us about the meeting itself. What's your recollection of what happened there?

A. Well, I recall I said -- told him, of course, that I was involved in this expert witness case,

attorneys had notified me that they were going to subpoena faculty members at the University of Louisville regarding the transgender topic.

Nothing -- I -- I'd done, as you refer to, a number of expert witnesses throughout my career and nothing like this had ever happened, so I was concerned at the unusual nature of this and that my chairman needed to know, and I notified him.

I think that was the meeting when he said, yeah, he'd heard some things from different corners of the campus. That's his phrase.

Q. Okay.

A. But that's all he said.

Q. Did you ask him to elaborate on what he meant from -- by he heard things from different corners of campus?

A. I think I did. It was something like people -- I actually can't fully recall what he said, but he did say he'd heard from different parts of the campus.

Q. Okay. So you have this meeting with Dr. Woods, he says, "I've -- I've heard some things from corners of campus," and then, what, you ended the meeting and -- and what happens next?

A. In terms of the sequence and narrative,

nothing really happened much between me and his office. We scheduled another meeting for two weeks later, and I would see him monthly or every two weeks depending on what was happening in the division, and the day before that meeting we had a faculty meeting which I think I refer to in the complaint, but was -- was quite explosive and very attacking of me and my leadership, and it was just a stunning meeting. I will use that word.

Q. And so this would've been sometime in mid November 2017?

A. Correct.

Q. Okay.

A. I believe the date was November fif -- 15th.

Q. Okay. I realize that's been a few years, but tell me, to the best of your recollection, what you recall occurring in that meeting, who said what, what made it, in your words, explosive or stunning.

A. Well, there were three or four faculty members who obviously had prepared to come to -- to the meeting, it was a regular routine meeting, with things to say. It started out with I announced that I would be serving as head of the division's representative to the department's diversity committee, and the reason I was going to do that is

I'd asked for about a month, six weeks for volunteers and no one volunteered, so I then said I would do that.

One of the faculty members, a junior person, said, "Well, you can't do that because we -- we don't trust you to talk about diversity," something of that nature.

Q. Do you recall who it was?

A. Then -- pardon me?

Q. Do you recall who that junior faculty member was?

A. It was Dr. Christine Brady.

Q. Okay.

A. And then after that -- and again, as best I can remember the sequence, a number of people had seen my presentation at Heritage, which was online at that point. That was the main focus of -- of their anger.

I think some may have known of my expert witness, but not many, and certainly maybe just one or two might have been aware of what I said or was -- had said in my report. I'm not sure that that was even public at that point, but it was mainly the Heritage presentation and their angry -- anger at that, and it really was a meeting where --

where things kind of took off there.

One individual said, you know, I needed to make an apology to the university, and I literally was perplexed. Apologize for what? Then it was clear that they disagreed with my opinion on certain clinical matters, and then the meeting ended. It was a very, very distressing meeting from the standpoint of collegiality, professionalism, and so forth.

Q. Do you recall the identity of the faculty member who demanded the apology?

A. Jennifer Le was her name, Dr. Le.

Q. Okay. So -- so you have this faculty meeting on we think November 15th of 2017 where these things we just --

A. I think that was the date.

Q. Yeah. Where -- where these things occur. What did you do in response to that faculty meeting, if anything?

A. Well -- well, there wasn't anything immediate that I did. I had the meeting with Dr. Woods the next day, and we discussed it and reviewed it, and we went over a number of things, and he encouraged me to -- or he didn't encourage me, just said a number of my faculty disagree with me, and I said I

was aware of that and I would deal with it.
Q. Okay. You said you -- you went over a number of things with Dr. Woods. What's your recollection of -- of what -- what you and Dr. Woods discussed in that meeting?
A. Well, first of all, he came prepared to say something and was basically a statement that the -- my first amendment rights and that I could say whatever I wanted to in -- in the university and that that was not the issue, but he was concerned -- I think he phrased it all my faculty was against me or something to that nature.
Q. Uh-huh. Anything else that you recall from that meeting with Dr. Woods?
A. That was the main thrust. And then I -- I had said -- of course, by that point I'd been chief of division several universities over almost 30 years, that I knew how to do the job. I dealt with a number of different, to use a lay phrase, kind of mutiny situations, I was able to work through them, deal with conflict, get resolution, and I think that was one of the reasons that I was sought to be leader, I could do that, I did it effectively.
So I didn't think anything of it and I

thought we had to address this and he accepted that, and I believe that was -- that was -- a couple of other things came up that he -- I asked him did he want me to step down because it was that explosive. He said, "Oh, no, no. I don't want to do that, I want you to stay."

Q. Uh-huh. So you raised the issue of did he want you to step down, and he -- he says no.

A. Yes, I did.

Q. Okay.

A. Yes, I did. He definitely said no, he wanted me to stay.

Q. Why did you -- why did you raise that possibility of you stepping down? What was the thought process on your end?

A. Because the tenor of the meeting, in -- in addition with his comment that there are problems in different parts of the campus, I was concerned that, you know, I was creating a problem for him and his department and -- and did I need to step down on that basis. It was more of a -- I wouldn't say a rhetorical question, but it -- it was a question that I did want an answer to and he gave me one.

Q. Okay. Did you think that Dr. Woods -- Dr. Woods' perception of the -- the faculty feeling

Wednesday university's activities pretty much shut down at noon on Wednesday before Thanksgiving.

And I said, "Can we -- can we wait 'til after Thanksgiving?"

He says -- I didn't understand the urgency. I wasn't told the reason for it, but we just must meet, we must meet.

And at that point I had several things planned prior to Thanksgiving, I -- I actually had a physician's appointment that afternoon that I needed to attend, so we basically worked out then to meet off campus at a restaurant. I believe it was November 22nd.

Q. Okay. So let me back up. Dr. Woods' assistant or secretary, was that Ruby Keith?

A. Yeah, that would've been Ruby Keith. Yes.

Q. Okay. So -- so she reaches out to you and eventually you and Dr. Woods have a meeting off campus at a restaurant on the 22nd of November?

A. Right.

Q. And going into that meeting, were you informed about what the issue was that -- that he needed to meet with you about?

A. No.

Q. Okay. So I take it you -- you show up at

this meeting with Dr. Woods on the 22nd at a restaurant. Tell -- tell me what you recall about that meeting.

A. Well, of course, I was curious as to what the meeting was for and the urgency of it because I just, you know, met with him, what would that have been, just less than a week earlier, five or six days earlier.

Q. Uh-huh.

A. And so I wanted to see what he had to say. It was basically a few kind of routine things about running the division and collections and using insurance and things that -- that needed to be covered.

There was remarkably little mentioned about the previous week's meetings, and I think we might have covered, again, that faculty was against me, and I think I may have assured Dr. Woods that I was going to get to that and I recognized that.

But I had the distinct feeling at the end of the meeting, like why did we have to meet? This was essentially nothing new. He seemed anxious and nervous at the meeting.

Q. Did he -- did Dr. Woods tell you anything that -- that led you to believe that there was more

information that he had obtained or more folks that he had spoken with than in the prior --
A. No.
Q. -- meeting?
THE REPORTER: I'm sorry?
A. No.
Q. So -- so from your perspective it was really just nothing new from the -- from the past meeting. Is that fair --
A. Well, clearly there was -- it was a -- there was a time of tension on campus and in our division, and -- and I was taking that seriously, so in that sense it was more of a monitoring meeting, but there was nothing substantively new, that's correct.
MR. BARHAM: Dr. Josephson, make sure you wait until they finish their question before you start your answer.
A. Okay.
Q. Yes. Zoom is a particularly strange technology with these depositions, so we'll -- we'll all bear with each other as we go through this, but you're doing a -- you're doing a great job on -- on the nuts and bolts so far, so keep it up.
So you have this meeting with Dr. Woods shortly before Thanksgiving at the restaurant.

Where did you and Dr. Woods sort of leave things at the end of that meeting? Was there an action plan or a -- a to-do list or anything like that?

A. As best I can recall, the -- the one issue about using insurance versus pa -- patients paying out of pocket, we discussed that topic, and then I restated that I would meet with my faculty once the holiday was complete to address the ferment that was developing.

Q. I missed a word there. To address the what that was developing?

A. I used the word ferment, the -- the upset, the tension that was -- was there. He had instructed me in the meeting before, "Well, you need to address your faculty about this," and I assured him that I would do that.

That, of course, had not happened because this was just four days later from -- from that previous meeting. So I think he again stated, you know, "People are unhappy with you," something to that effect.

Q. Okay. And in your complaint in paragraph 178, you stated that in -- in all of your 15 years as division chief and over 35 in academic medicine, including at two other major universities, this was

A. Yes.
Q. Okay. The -- the demotion from division chief in the letter from Dr. Woods spells out various -- various consequences of the demotion in terms of what would be expected of you as a faculty member going forward; is that fair to say?
A. There were some general statements, yes.
Q. Okay. And among those was that you would be expected, without the administrative work of the division chief, to pick up additional work in other areas of clinical or other responsibilities; is that fair to say?
A. Yes.
Q. Okay. Tell me how that -- how that played out over time from early December going forward in terms of sort of reshaping what your role was going to be at the university and what those expectations were.
A. When you say played out over time, what -- what length of time are you talking about?
Q. Well, let -- let's just start with the -- the winter of 2017, 2018. We're talking about the time when Drs. Le, Lohr, and Carter are first instituted as the interim co-chiefs of the division, you get this letter from Dr. Woods. There's got to be some

sort of transition period as you go forward from division chief to nondivision chief. Talk a little bit about how that played out.
A. Well, the first things were, of course, to give some information to Carter, Le, and Lohr about the division and how it was run and key areas they needed to know about, so I gave them a list of responsibilities and key issues. We had -- and that was sent to them early in December.
Not too much happened after that, actually, 'cause I was banned from faculty meetings and discouraged to talk to people, frankly, so -- and I was trying to meet with Dr. Woods for some further clarification on matters, so I was trying to, personally myself, gain some access and talk to the senior administration. That was much of January and February.
Q. Okay. The -- the division meeting -- the department meetings that you were banned from, that was spelled out, was it not, in the -- in the letter from Dr. Woods, that you should not attend the division meetings at least until February or something like that. Am I right about that?
A. I think that was in the letter. I -- I couldn't recall.

A. Yes.
Q. Okay. I'm -- I'm looking at the -- at paragraph 236. It says, (Reading) Due to the demotion, Defendant Woods ordered Dr. Josephson to "add a half day of clinical work per week when not on inpatient duty."
Does that ring a bell to you?
A. Yes.
Q. Was that something that was in his demotion letter?
A. Yes.
Q. Then going on to paragraph 237, it says that Defendant Woods promised to "advocate to leave Dr. Josephson's salary intact through the end of this academic year."
Does that ring a bell to you?
A. Yes.
Q. That was the -- the administrative supplement portion of your compensation, right?
A. Yes.
Q. During this time frame, from November 2017 through -- through the nonrenewal of your faculty appointment, your base salary remained the same, did it not?
A. Yes.

Q. The administrative supplement, I want to say it was like $10,500 a year as the division chief, was eventually discontinued around February of 2018; is that right?

A. Yes.

Q. Was there a discussion with Dr. Woods or with anyone else that you recall about the discontinuation of that administrative supplement?

A. No.

Q. Okay. How did you learn of the discontinuation of that administrative supplement?

A. When I got my next paycheck.

Q. Okay. Would -- would that have been a paycheck in -- and I've got to confess, I don't know if it's a weekly, semi -- semimonthly, monthly, whatever, payroll. Would that have been a paycheck that you received sometime in March of 2018?

A. Yes. I'm trying to recall. I think it might've even been a month earlier.

Q. Okay.

A. I think -- I think it was, actually. So my paycheck at the end of February, which was for the month of February, I think, but there was no communication about it going to happen.

Q. Was there any communication after you learned

decision to demote you from the division chief role?
A. I don't know.
Q. Is it true that Dr. Woods left the university at the end of June/beginning of July 2018?
A. Yes.
Q. And isn't it true that Dr. Boland became the chair or interim chair of the Department of Pediatrics at that time?
A. Yes.
Q. So Dr. Woods would not have been involved in the decision not to renew your faculty appointment; is that correct?
A. I -- I believe so, yes.
Q. Okay. In fact, Dr. Woods left the university and went down to Tennessee, Chattanooga, I believe; is that right?
A. That's my understanding, yes.
Q. Have you kept in touch at all with Dr. Woods since -- since he left the University of Louisville?
A. I have not.
Q. Okay. And I apologize if I've asked this before. Dr. Boland, you're -- you're not suggesting that she took any action directly toward you that created a hostile work environment or anything of that nature, are you?

upon you or -- do you see what I'm saying?

A. I was asked to do more clinical time and one of the assignments was telepsychiatry. It could've been something else, but that's what it was.

Q. Uh-huh. Who was it that asked you to -- to do more telepsychiatry?

A. Dr. Le.

Q. Okay. Was that in a -- in a phone call? In an email? In some other communication that you recall?

A. Several communications and I think there were a couple of emails, I recall.

Q. During that time frame of late 2017 through 2018, were you asked or expected to do more work than others in the division?

A. When you say work, I'm not sure what you're referring to.

Q. Yeah, that's -- that's a fair point. I see in your complaint that you talk about your clinical duties consisting of consulting with the Bingham Clinic therapists and -- and clinicians, conducting individual and family psychotherapy at the Bingham Clinic, conducting specialty family therapy consultations.

And then at some point you say that Dr. Woods

replaced those duties with 16 hours per week with a goal of having at least 13 be billable of outpatient therapy, and to rejoin regular faculty rotation for weekend inpatient therapy, and I just picked those as an example for -- from the complaint.

But just in terms of sort of the day-to-day expectations of what your job would be, I want to know, were you tasked with things that were greater than what others in the division normally were tasked with -- with doing, if that makes sense?

A. I wouldn't say greater than, but it equaled a good number of -- of faculty members.

Q. Okay. In terms of research requirements or research expectations, did that change during this period for your role, the period from late November of '17 on through 2018?

A. Yes. A research component was added for the year of 2018.

Q. Okay. And who added that research component?

A. Dr. Woods.

Q. Okay. Was there a discussion with Dr. Woods about that research component being added that you recall?

A. No. No.

Q. Was this something in a -- in an annual work

plan? Or I guess I'm -- I'm curious how that came about and how it was communicated to you.
A. It really was communicated through the annual work plan.
Q. All right. There -- there is an allegation in the complaint that in August 2018 Dr. Le decided that you would only receive $2,700 in funds for academic travel, dues, and books for the upcoming academic year. Do you recall that?
A. Yes.
Q. Is it not true that the -- that budget cuts on those expenditures were division-wide?
A. I'm sorry. Which expenditures? That's not clear.
Q. Academic travel, dues, and books.
So I guess the question is what information do you have that the decision to reduce your budget for dues and books and travel was specific to you rather than division-wide for faculty members, if that makes sense?
A. Well, the amount of funds, I was at a quite a bit higher level relu -- related to my being chief, and so then it got reduced, and it may have been the same as other people, I don't know.
Q. Okay. Well, you -- you wouldn't have

MR. BARHAM: That works.
MR. ROGERS: All right.
THE VIDEOGRAPHER: We're going off -- we're going off the record. The time is 11:08 a.m.
(Recess from 11:08 a.m. to 11:19 a.m.)
THE VIDEOGRAPHER: We're going back on the record. The time is 11:19 a.m.
Q. All right. Dr. Josephson, we're back on the record and you understand you're still under oath?
A. Yes.
Q. All right. In looking at the complaint, one of the allegations is that before the demotion your nonclinical duties included managing the division's clinical, educational, and scholarly activities; recruiting faculty and clinicians; serving on numerous boards; mentoring faculty; and serving on a task force studying the overuse of medication in foster children. Do you recall that?
A. Yes.
Q. And the -- the next allegation is that after the demotion, Defendant Woods took all of those activities away from you. What is the -- well, when did Defendant Woods take those activities away from you? Was it part and parcel with the demotion or was it a separate decision?

A. Part and parcel with the demotion.

Q. Okay. The -- the complaint also talks about before the demotion that your teaching duties included supervising outpatient therapy, assisting the training director in managing his or her programs, working with continuing medical education programs, teaching resident seminars, and directing ongoing recruitment necessary each year.

And the complaint goes on to say, "After the demotion, Defendant Woods stripped Dr. Josephson of his roles assisting training directors, also making it untenable to work with continuing medical education programs."

Same question there, was that part and parcel with the demotion from the division chief role or was that a separate decision?

MR. BARHAM: If you know.

A. I would say, again, part and parcel.

Q. Okay. There's another allegation that before the demotion you had no formal research requirement as part of your job duties, although you authored -- excuse me, authored numerous works as part of your leadership role in the division and in the field, and that after the demotion Defendant Woods required you to generate scholarly research on an annual

basis.
Same question --
A. Yes.
Q. -- with regard to that.
A. So what is the question?
Q. The question is was that requirement to generate scholarly research on an annual basis part and parcel with the demotion or was that a separate decision that happened independently?
A. I believe it was a separate decision.
Q. Okay. What -- what --
A. The work assignment of 2018.
Q. Okay. So that -- that would've been part of the AWP, the annual work plan, for the following academic year?
A. Yes.
Q. Okay. And that AWP comes out -- and I know we talked about May. Is that the same thing?
A. No.
Q. Okay. When -- when would that AWP with the -- the increased research requirement have come out?
A. Usually earlier in the year. Varied.
Q. Okay.
A. February was a general time.

Q. Okay. So the best of your recollection is that that increased research activity requirement came out and was communicated to you around February of 2018?

A. Yes.

Q. (Reading) In addition, the decision to demote Dr. Josephson chilled his protected expression, particularly on matters related to gender dysphoria. In April 2018, Dr. Josephson cancelled a scheduled presentation at the annual meeting of the Christian Medical and Dental Association on the research regarding gender dysphoria in youth because of the demotion and fear that further remarks on this subject would spark additional adverse action.

You recall that allegation?

A. Yes.

Q. What was the -- what were the details with respect to that Christian Medical and Dental Association meeting and how it came about that you cancelled that presentation?

MR. BARHAM: Objection. Compound question.

A. That was a regularly scheduled annual meeting of this organization. I was put on the program earlier, and it was just not possible to fulfill that obligation with what happened at the

university.

Q. Okay. So if I understand correctly, and -- and tell me if I'm wrong, nobody at the University of Louisville instructed you to cancel your presentation in 2018 to the Christian Medical and Dental Association, but rather it was a situation where, because of your work expectations, you did not see that it was possible to go forward with that presentation. Is that accurate?

A. Yes.

Q. Okay. There's another allegation that due to the demotion, you lost your position in the American Association of Directors of Child and Adolescent Psychiatry. Do you recall that?

A. Yes.

Q. How was it that you came to lose your position in that association?

A. Well, you -- you can only have full membership if you direct a division, so once I was demoted, I could no longer be part of that formal organization.

Q. Okay. So that -- the loss of that position with the American Association of Directors of Child and Adolescent Psychiatry was a byproduct of the demotion from the division chief role; is that fair

to say?

A. Yes.

Q. There's also an allegation that you planned to complete numerous academic projects before the demotion, and that those included a book that was to be published by Oxford University Press, and that due to the demotion those projects had to be discontinued. Do you recall that?

A. Yes.

Q. What was the -- the book that was to be published by Oxford?

A. It was on the topic of family therapy and child and adolescent psychiatry.

Q. Okay. Did you have a contract with Oxford University Press for that book?

A. No.

Q. Okay. But there was a -- there was some sort of a plan or an agreement of some sort for that book to be published?

A. Yes.

Q. Tell -- tell me what you recall about that arrangement.

A. Well, I met with the publisher at our annual meeting, we discussed the outline of the book and the need for certain aspects of family therapy to be

published, and -- and I was working with -- with the publisher in -- in plans and they were sending me their requirements.

Q. Okay. And at some point that -- that -- the publication of that book had to be discontinued; is that right?

A. Yes.

Q. How did that come about, that discontinuation, that is?

A. Well, with the activities going on with my increased responsibilities at the university, the hostile environment, there was just no space for focused academic work in that regard.

Q. Okay. So am I right to say that nobody at the University of Louisville expressly prohibited you from engaging in the publication of that book?

A. No one prohibited me from publi -- publishing that book.

Q. Okay. But your -- your -- your statement a second ago about the -- the -- with the hostile environment being an obstacle, that's my word, not yours, to the publication of that book, I wonder, can you expand on what you mean by the hostile environment and how that impacted your ability to publish the book?