UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ALLAN M. JOSEPHSON                                                    Plaintiff

v.                                                   Civil Action No. 3:19-CV-230-RGJ

TONI GANZEL, *et al.*                                               Defendants

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Defendants Charles R. Woods ("Woods"), Bryan D. Carter ("Carter"), William D. Lohr ("Lohr"), Toni M. Ganzel ("Ganzel"), Jennifer F. Le ("Le"), and Kimberly A. Boland ("Boland" together with Woods, Carter, Lohr, Ganzel, and Le, "Defendants"),  each moved individually for summary judgment.  [DE 58-1 (Woods); DE 59-1 (Carter); DE 60-1 (Lohr); DE 61-1 (Ganzel); DE 62-1 (Le); DE 63-1 (Boland)].  Plaintiff Allan M. Josephson ("Josephson") responded [DE 72] and Defendants replied [DE 74 (Woods); DE 75 (Carter); DE 77 (Lohr); DE 78 (Ganzel); DE 76 (Le); DE 79 (Boland)].  Josephson also moved for summary judgment against all Defendants.  [DE 64-1].  Defendants jointly responded to Josephson's motion [DE 71] and Josephson replied [DE 80].  Defendants moved to exclude testimony from Plaintiffs' expert.  [DE 56-1].  Plaintiffs responded [DE 69] and Defendants replied [DE 73].  Briefing is complete, and the matters are ripe. For the reasons below, the Court **DENIES** Wood's Motion for Summary Judgment [DE 58-1], **DENIES** Carter's Motion for Summary Judgment [DE 59-1], **DENIES** Lohr's Motion for Summary Judgment [DE 60-1], **DENIES** Ganzel's Motion for Summary Judgment [DE 61-1], **DENIES** Le's Motion for Summary Judgment [DE 62-1], **DENIES** Boland's Motion for Summary Judgment [DE 63-1], **DENIES** Josephson's Motion for Summary Judgment [DE 64-1], and **DENIES** Defendants' Motion to Exclude Expert Testimony [DE 56-1].

1

# I.   **BACKGROUND**

## A.  **Josephson**

In January 2003, Josephson, a board-certified psychiatrist, joined the faculty of the University of Louisville as a Professor of Psychiatry and the Chief of the Division of Child and Adolescent Psychiatry and Psychology ("Division").   [DE 64-1 at 1800].   The University of Louisville School of Medicine includes 23 separate departments.   [DE 61-1 at 1319].   The departments are further divided into divisions.   [*Id.* at 1320].   Josephson was a non-tenured faculty member in the Department of Pediatrics ("Department") [DE 58-1 at 942], which included 22 separate divisions.   [DE 61-1 at 1320].

During his time as Chief, Josephson added new faculty to the Division, enhanced its national profile, balanced its budget, expanded programing, and increased the number of patients treated.   [64-1 at 1800–801].   Josephson maintained a clinical schedule and taught at the medical school.   [*Id.* at 1801].   He also gave numerous presentations and authored or contributed to dozens of works. [*Id.*].   In light of these achievements, Josephson received awards from the American Psychiatric Association and the American Academy of Child & Adolescent Psychiatry.   [*Id.*].   Josephson's annual performance evaluations improved from 350 and 370 in 2012 and 2013 to a perfect 400 through 2017.   [*Id.* at 1802].

Around 2014, Josephson became interested in gender dysphoria.   [64-1 at 1801].   From 2016 to 2017, Josephson served as an expert witness on in several cases regarding gender dysphoria in children.   [*Id.*].   Josephson testified that "children are not equipped to make far-reaching life decisions, how trying to change one's sex poses medical and other consequences that one cannot fully appreciate until adulthood, and how most gender dysphoric children cease to

experience it by late adolescence." [*Id.* at 1801–802].  After inquiring, Woods told Josephson that testifying in these cases did not require prior approval.  [*Id.* at 1802].

In October 2017, Josephson participated in a Heritage Foundation panel in Washington, D.C., entitled *Gender Dysphoria in Children: Understanding the Science and the Medicine.* [*Id.*]. He opined that "gender dysphoria is a socio-cultural, psychological phenomenon that cannot be fully addressed with drugs and surgery.  Thus, doctors and others should explore what causes this confusion and help the child learn how to meet this developmental challenge." [*Id.* at 1802–803].

### B.  Woods

Woods is a pediatrician focusing on infectious diseases who became a faculty member at the University of Louisville in 2006.  [DE 58-1 at 941].  In 2016, Woods became Interim Chair of the Department of Pediatrics in the School of Medicine ("Department") and Chair of the Department in October 2017.  [*Id.*].  While Chair, Woods oversaw more than 20 divisions within the Department.  [*Id.* at 941–42].  Josephson, like all other division chiefs, reported to Woods and served at the pleasure of the Chair of the Department.  [*Id.* at 942].  Woods testified that the division chiefs served as the faces of their respective divisions.  [*Id.*].  Woods left the University in June 2018.  [*Id.* at 948].

### C.  Carter

Carter is a psychologist in the Division at the University of Louisville School of Medicine. [DE 59-1 at 1051].  Carter served as the section chief of psychology, meaning Carter reported to Josephson until December 4, 2017.  [*Id.*].

The Endocrinology Division of the Department, overseen by Chief Kupper Wintergerst ("Wintergerst"), established a gender clinic to treat pediatric patients experiencing gender dysphoria.  [*Id.* at 1052].  The endocrinology gender clinic enlisted Christine Brady ("Brady"), a

psychologist who worked in the Division.  [*Id.*].  As a member of the psychology faculty, Brady reported to Carter, the section chief.  One day, Josephson shadowed Brady in the endocrinology gender clinic.  [*Id.* at 1053].  Brady believed Josephson was attempting to insert himself into the gender clinic without permission from Wintergerst and questioned Josephson's judgment about clinical approaches to treating gender dysphoria in children.  [*Id.*].  Brady reported these concerns to Carter, her section chief, but Carter did not take any action at the time.

### D.  Lohr

In 2017, Lohr was a regular faculty member of the Division, the same period when Josephson was Division Chief.  [DE 60-1 at 1254].  After Josephson resigned as Division Chief, Lohr, Le, and Carter were appointed to serve jointly in the position on an interim basis.  [*Id.*].  During this time, Josephson reported to Lohr, Le, and Carter jointly in their capacities as Interim Co-Chiefs.  [*Id.*].

### E.  Ganzel

Ganzel is a pediatric otolaryngologist surgeon who served as the Dean of the School of Medicine at the University of Louisville since May 2013.  [DE 61-1 at 1319].  As Dean, Ganzel's primary duties are to oversee all aspects of the academic mission of the School of Medicine and achieve the School of Medicine's objectives, including those associated with education, research, clinical care, and community engagement.  [*Id.*].  Ganzel oversees 23 separate departments, including five "basic science" departments and 18 "clinical science" departments.  [*Id.* at 1319–20].  Ganzel also oversees the Office of Faculty Affairs, Diversity, Student Affairs, Curriculum, and Finance.  [*Id.* at 1320].  Due to the scope of her responsibilities, Ganzel is heavily reliant on her leadership team, which includes the 23 department chairs.  [*Id.*].  Ganzel testified that it is primarily the department chairs, not Ganzel, who make faculty decisions.  [*Id.*].  Although Ganzel

4

ultimately approves non-renewals, department chairs have the discretion to renew or not renew faculty appointments. [*Id.* at 1320–21].

### F. Le

Le is a psychiatrist in the Division who began working at the University of Louisville in 2008. [DE 62-1 at 1426]. From 2008 to 2017, Le reported to Josephson in his capacity as Division Chief. [*Id.*]. In December 2017, Le was appointed to serve as one of the three interim co-chiefs of the Division alongside Carter and Lohr. [*Id.* at 1424]. Approximately one year later, Le became the only permanent Division Chief, making him Josephson's direct supervisor. [*Id.*].

### G. Boland

Boland, a pediatric hospitalist, has been a member of the University of Louisville's medical practice since 1997. [DE 63-1 at 1579]. In 2017, Boland was Executive Vice Chair for the Department. [*Id.*]. Boland's responsibilities, among other things, included assisting with some division chiefs' annual reviews (not including Josephson's) and assisting Woods as needed. [*Id.*]. Boland indicates that Josephson's poor performance eventually led her to recommend the non-renewal of Josephson's appointment. [*Id.*].

### H. Events Leading to Josephson's Demotion and Non-Renewal

Josephson alleges that the campaign against him started five days after news of his presentation at the Heritage Foundation reached Brian Buford ("Buford"), the director of the University of Louisville's LGBT Center. [DE 64-1 at 1803]. Buford eventually emailed Ganzel to complain about Josephson's remarks. [*Id.*]. Although Ganzel did not act on Buford's email, she expressed concern that students may have been hurt by Josephson's comments or actions. [DE 68-38, Ganzel Dep. Tr. at 3914].

Following Josephson's presentation at the Heritage Foundation, individuals outside the Division began circulating videos of the presentation and discussing it with others at the University of Louisville.  [DE 59-1 at 1053].  Josephson concedes that Carter received a handful of phone calls and inquiries from outside the Division, but Josephson claims that "[t]hey were no big deal." [DE 72 at 4573].  These discussions dovetailed with concerns about Josephson's work as an expert witness in childhood gender dysphoria cases.  [DE 58-1 at 943].  Brady informed Carter of the presentation before receiving additional inquiries from outside the Division, which were concerned about Josephson's approach to treatment of childhood gender dysphoria and how this reflected on the Division.  [DE 59-1 at 1053].  Carter spoke with other faculty members in the Division who also expressed concern that Josephson's opinions would be portrayed as opinions of the Division before conveying these concerns to Woods.  [*Id.* at 1054; DE 64-1 at 1806].  Carter also relayed concerns that Josephson was inserting himself into to the endocrinology gender clinic, placing Brady in a difficult position as a junior faculty member.  [DE 59-1 at 1054].

On November 2, 2017, Josephson met with Woods.  During this meeting, Woods advised Josephson that he had concerns regarding Josephson's extracurricular work.  [DE 58-1 at 943]. Specifically, Josephson's work as an expert witness should be done on his own time and he should make it clear that the opinions were his and not those of the University.  [*Id.*].  Woods also noted that Josephson's opinions may be promoted by others outside the University in ways that Josephson did not intend.  [*Id.*; DE 72 at 4579–80].

On November 6, 2017, Carter met with Josephson to request that Josephson address tension in the Division at an upcoming faculty meeting.  [DE 59-1 at 1054].  Carter, feeling his conversation with Josephson had not been well received,  informed Woods that other faculty had expressed concern about the amount of time Josephson was spending away from the office serving

as an expert witness. [*Id.*]. He also informed Woods that this, along with Josephson's refusal to allow Brady to work with other doctors in the Department, was contributing to the tension in the Division. [*Id.*]. Carter also expressed his concerns to Boland. [DE 63-1 at 1580]. Carter spoke to Josephson again on November 14, and he agreed to address tension in the Division. [DE 59-1 at 1054].

On November 15, 2017, Josephson led a regularly scheduled faculty meeting with members of the Division. During the meeting faculty members aired their concerns about Josephson's conduct. [DE 62-1 at 1427]. Brady also explained that she did not believe Josephson, the self-appointed Department representative to the diversity committee, was an appropriate representative to the committee. [*Id.* at 1428]. Le agreed with Brady and testified that there had been concerns expressed by minority trainees and she had "heard rumblings over several years" regarding Josephson's behavior. [*Id.*]. Attendees recall Josephson yelling during the meeting and accusing the faculty of staging "a coup" against him before abruptly ending the meeting. [DE 58-1 at 944–45; DE 59-1 at 1055; *Id.* at 1429]. Josephson testified that Le, Carter, and Stocker requested he either apologize for his controversial remarks or issue a statement through the University's public relations department explaining that his opinions were his own and not given on behalf of the University. [DE 64-1 at 1807].

Less than two weeks later, Josephson testified in an unrelated matter that his presentation at the Heritage Foundation was not the source of discord at this meeting. [DE 59-1 at 1055]. Instead, he testified that his presentation at the Heritage Foundation "wasn't the thrust" of the meeting. [DE 71-14 Josephson Dep. Tr. at 4394]. Josephson asserted that two faculty members had problems with his behavior as chief, "[b]ut there weren't comments on the presentation itself." [*Id.*]. Another faculty member was concerned Josephson had been quoted by a news site, and a

fourth faculty member was worried that Josephson's views would be attributed to the Division. [*Id.*]. In response to his own testimony, Josephson asserts that he gave this deposition "before he had a chance to process anything or reflect even for a few minutes on what led to Defendants' rash decision" to demote him. [DE 72 at 4580].

On November 16, 2017, Josephson met with Woods to discuss the contentious faculty meeting and to encourage Josephson to mend relationships with distraught faculty members. [DE 58-1 at 945]. Josephson then met individually with faculty members. [*Id.*]. However, Woods asserted that Josephson's meetings tended to further the divide between himself and faculty members. [*Id.*]. On November 17, Carter and Brady raised allegations of gender bias, which caused Wood to reexamine gender inequities in the Division that he had previously noticed. [*Id.* at 946]. Woods met with Josephson again on November 22, to discuss the rift between Josephson and faculty. [*Id.*]. Josephson testified that he recognized the faculty was against him and assured Woods that he planned to address the problem. [DE 58-3 Josephson Dep. Tr. at 1005]. Still, Woods stated that Josephson continued to appear angry with co-workers and he feared the work environment in the Division would become toxic. [DE 58-1 at 946–47].

On November 28, Woods sent Josephson a letter requesting that he resign as Division Chief. [DE 19-7]. In the letter, Woods states that the decision to ask for Josephson's resignation "is my decision, made in accordance with what I see as the best interest of the Division and Department." [*Id.* at 318]. Although Boland claims that Woods made the final decision, she concedes that she acted as a "sounding board" for Woods and agreed with the decision. [DE 63-1 at 1582]. Ganzel also approved Woods' decision to send the letter. [DE 64-1 at 1808]. Woods claimed that he had lost confidence in Josephson's ability to lead the Division for several reasons: faculty concerns about Josephson's leadership; the visibility of Josephson's activities potentially

8

effecting faculty and student retention; and faculty concerns that Josephson had displayed gender bias.  [DE 19-7].  On November 29, Josephson submitted a letter of resignation from his role of Division Chief with an effective date of December 4.  [DE 58-1 at 947].  Because Josephson was no longer serving as Division Chief and was no longer responsible for managing the Division's clinical activities, recruiting faculty, assisting training directors, or serving on boards and task forces, he was required to increase his clinical load.  [*Id.* at 947–48].  His salary remained the same, excluding the $10,500 Division Chief supplement, and he received the same amount of money to use for continuing education and medical license dues as other faculty members.  [*Id.*].  After resigning as Division Chief, Josephson claims Brady, who is not a defendant to this action, attempted to discredit his work as an expert witness by identifying others who could discredit him in active cases.  [DE 64-1 at 1809].

Effective on Josephson's resignation as Division Chief, Woods and Boland nominated three faculty members to serve as interim co-chiefs: Le, Carter, and Lohr.  [DE 63-1 at 1582–83].  As Interim Co-Chiefs of the Division, Le, Carter, and Lohr became responsible for developing Josephson's work assignment.  [*Id.* at 1583].  Le, Carter, and Lohr met on January 16, 2018, to discuss Josephson's transition and develop a work plan.  [DE 62-1 at 1432].  Josephson's work plan would include three telepsychiatry shifts each week and 16 hours per week seeing patients with a goal of billing 13 hours of patient care.[1]  [*Id.*].  Based on complaints, Josephson was also given certain expectations related to his continued work as faculty.  [DE 65-10 at 1970].  Among those expectations, Josephson would be restricted from discussing insurance coverage or self-payment with patients, pursuing interests in LGBTQ advocacy during work hours, treating LGBTQ patients, initiating individual meetings with faculty and staff to discuss his resignation as

---

[1] Le testified that Josephson's hours of patient care were adjusted downward three times.  [*Id.*].

Division Chief, utilizing his personal assistant, and failing to refer to LGBTQ patients by their preferred pronouns. [*Id.* at 1970–71]. Josephson was also asked to note where he differed from the University's gender dysphoria curriculum, but the curriculum was not formalized until mid-2018. [DE 64-1 at 1810–11].

Despite the new standards and expectations, Josephson billed only 2.5 hours of patient care in January 2018. [DE 59-1 at 1058; DE 62-1 at 1433; DE 63-1 at 1583]. Le, Lohr, and Carter began receiving and cataloging complaints related to Josephson. [DE 64-1 at 1811]. These complaints ranged from dismissive and misogynistic comments to using University resources for non-University business. [DE 65-46]. Le, Carter, and Lohr met with Josephson on March 23, 2018, which became heated.[2] [DE 64-1 at 1814–15]. Yet they did agree to reduce Josephson to 12 hours per week in the clinic based on his telepsychiatry hours. [DE 59-1 at 1059]. Le, Carter, and Lohr met with Josephson again on July 9, 2018, to discuss his performance. [DE 59-1 at 1059; DE 62-1 at 1433; DE 64-1 at 1817]. Le, Carter, and Lohr memorialized the meeting in a letter to Josephson on July 14, which outlined issues with Josephson's work assignments and productivity. [DE 59-1 at 1059; DE 60-1 at 1257; DE 62-1 at 1434]. The letter discussed Josephson's failure to meet outpatient clinical hours and telepsychiatry hours, updated work assignments, failure to attend faculty meetings, unexcused absences from work, and prohibited discussions about self-paying arrangements with patients. [59-18]. Throughout the summer and fall of 2018, Le, Carter, and Lohr continued to receive complaints about Josephson from students and those who worked with him. [DE 59-1 at 1060; DE 60-1 at 1257; DE 62-1 at 1434; DE 64-1 at 1819–20].

As the new Division Chief, Le periodically met with Boland about Josephson's performance. [DE 62-1 at 1434–35]. Le testified that she would have ideally liked to have seen

---

[2] Lohr admitted calling Josephson "childish, narcissistic, and flippant" during the meeting when Josephson refused to move ahead with discussions about his work assignments. [DE 60-1 at 1255–56].

Josephson meet his productivity targets, but he continued to fall short.  [*Id.* at 1435].  As Department Chair, Boland relayed concerns about Josephson's performance to Ganzel throughout 2018.  [DE 63-1 at 1584].  In early 2019, Boland recommended that Josephson's faculty appointment not be renewed [*Id.* at 1585] and Ganzel "affirmed" the decision [DE 61-1 at 1324].  On February 26, 2019, Ganzel sent Josephson a letter stating that his appointment would not be renewed beyond its expiration date of June 30, 2019.  [*Id.*].  On the same date, Boland and Le also met with Josephson to notify him of the non-renewal.  [63-1 at 1585].

In March 2019, Josephson brought this 42 U.S.C. § 1983 suit against Defendants, alleging violation of his First and Fourteenth Amendment rights by, among other things, retaliating against him for expressing his views on gender dysphoria.  [DE 1].  Josephson timely amended his complaint to base his claims on the non-renewal of his faculty appointment.  [DE 19].  He is not seeking relief related to the decision to demote him from Division Chief.  [*Id.* at 248].  Josephson's amended complaint alleges five counts under 42 U.S.C. § 1983 against Defendants: First Amendment Retaliation (Count 1), First Amendment Content & Viewpoint Discrimination (Count 2), Violation of Josephson's Right to be Free from Unconstitutional Conditions (Count 3), Violation of Josephson's Fourteenth Amendment Right to Due Process (Count 4), and Violation of Josephson's Fourteenth Amendment Right to Equal Protection (Count 5).  [DE 19].  Josephson claims that his national leadership was diminished, he lost teaching opportunities and progress on academic projects, he suffered financially, and Defendants' actions stopped him from obtaining a similar position at another university.  [DE 64-1 at 1822].  In support of his claims, Josephson disclosed expert Dr. James M. Cantor ("Cantor") to discuss treatment methods for childhood gender dysphoria.  [DE 56-3].

11

## II.   MOTIONS FOR SUMMARY JUDGMENT

The parties filed seven competing motions for summary judgment [DE 58-1; DE 59-1; DE 60-1; DE 61-1; DE 62-1; DE 63-1; 64-1].  Before the Court can address the merits of the motions for summary judgment, the Court must address various legal defenses.

### A.  Sovereign Immunity

Defendants argue that they are protected from suit by the Eleventh Amendment.  [DE 59-1 at 1089; DE60-1 at 1269; DE 61-1 at 1336; DE 62-1 at 1444; DE 63-1 at 1596].  In response, Josephson argues that Defendants are liable in their official capacities.  [DE 72 at 4626].

Any form of relief sought against a State in federal court is barred under the Eleventh Amendment unless the State has waived its sovereign immunity.  *See Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 58 (1996); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Hamilton's Bogarts, Inc. v. Mich.*, 501 F.3d 644, 654 n.8 (6th Cir. 2007).   The Commonwealth of Kentucky has not expressly waived its Eleventh Amendment immunity in the federal courts.  *See Morehead v. Barnett*, No. CIV.A. 5:13-329-DCR, 2014 WL 2801351, at *3 (E.D. Ky. June 19, 2014).

The Eleventh Amendment bar extends to actions where the State is not a named party but where the action is essentially one for the recovery of money from the state.  *Edelman v. Jordan*, 415 U.S. 651, 663 (1974); *Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459, 464 (1945).  A suit against state officials in their official capacities would be a way to plead the action against the entity of which the state officials are agents.  *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).  Thus, actions against state officials in their official capacities are included in the Eleventh Amendment bar.  *Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010) (citing *Cady v. Arenac Cnty*, 574 F.3d 334, 344 (6th Cir. 2009) ("[A]n official-capacity suit against

a state official is deemed to be a suit against the State and is thus barred by the Eleventh Amendment, absent a waiver.") (citation and ellipsis omitted)).

An exception to this immunity from suit applies if state officials are sued in their official capacities for prospective relief in the form of an injunction. *Ex parte Young*, 209 U.S. 123 (1908); *see also Kentucky v. Graham*, 473 U.S. 159, 169 n.18 (1985) ("In an injunctive or declaratory action grounded on federal law, the State's immunity can be overcome by naming state officials as defendants."). Josephson seeks declaratory and injunctive relief. [DE 19 at 254]. Accordingly, Josephson's official capacity claims must be allowed to proceed. *See Graham*, 473 U.S. at 169 n.18.

## B. Qualified Immunity

Defendants argue that they are entitled to qualified immunity on all counts. [DE 58-1 at 957; DE 59-1 at 1087; DE 60-1 at 1267; DE 61-1 at 1334; DE 62-1 at 1443; DE 63-1 at 1594]. That said, Josephson contends that the law is clearly established on every element of his claims. [DE 72 at 4628]. Accordingly, the Court will address qualified immunity as applied to Josephson's Amended Complaint.

### i. *Qualified Immunity Standard*

"Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). When advanced by a defendant, qualified immunity is a threshold question of law appropriately determined on a motion for summary judgment. *Harlow v. Fitzgerald*, 457 U.S. 800 (1983).

"Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The plaintiff bears the ultimate burden of proof in establishing that a defendant has no right to qualified immunity.  *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) (citing *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)).  That said, in moving for summary judgment based on qualified immunity, a defendant must first show "facts to suggest that he acted within the scope of his discretionary authority during the incident in question." *Id.*  The burden then shifts to the plaintiff to show "that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct." *Est. of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017).  If "undisputed facts show that the defendant's conduct did indeed violate clearly established rights[,]" or "if there is a factual dispute . . . involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights[,]" a court must deny summary judgment. *Gardenhire*, 205 F.3d at 311 (quoting *Poe v. Haydon*, 853 F.2d 418, 425–26 (6th Cir. 1988) (citations omitted)).

The Supreme Court requires a two-pronged approach when resolving questions of qualified immunity, although courts may decide the order in which to address these prongs "in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.  First, the Court must decide whether a plaintiff has presented facts sufficient to find a violation of a constitutional right. *Id.* at 232.  The Court views this evidence in the light most favorable to the plaintiff.  *See Shreve*, 743 F.3d at 134.  Second, the Court must decide whether the right at issue was "clearly established"

14

at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. Thus, qualified immunity applies unless the official's conduct violates a clearly established constitutional right. *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). If the court finds that the plaintiff's right was not clearly established, the Court can start with the second factor and does not "need to determine whether the alleged conduct was in fact unconstitutional." *Schulkers v. Kammer*, 955 F.3d 520, 532 (6th Cir. 2020) (citing *Pearson*, 555 U.S. at 236–43)).

> ii. *Analysis*

Josephson's claims are based on the First Amendment and his treatment after making remarks at a Heritage Foundation lecture. Defendants claim that they are protected from Josephson's First Amendment claims because he has not shown the existence of an established right. [DE 58-1 at 957; DE 59-1 at 1087; DE 60-1 at 1267; DE 61-1 at 1334; DE 62-1 at 1443; DE 63-1 at 1594]. In response, Josephson argues that the law is clearly established on every element of his claims. [DE 72 at 4628].

"For decades it has been clearly established that the First Amendment tolerates neither laws nor other means of coercion, persuasion, or intimidation 'that cast a pall of orthodoxy' over the free exchange of ideas in the classroom." *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 682 (6th Cir. 2001) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). "The linchpin of the inquiry is, thus, for both public concern and academic freedom, the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives." *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1189 (6th Cir. 1995). The Supreme Court has held that "[t]he classroom is peculiarly the 'marketplace of ideas.'" *Keyishian v. Board of Regents,* 385 U.S. 589, 603 (1967).

The Sixth Circuit applies a broad conception of public concern to a professor's speech. *See Dambrot*, 55 F.3d at 1189 (citing *Parate v. Isibor*, 868 F.2d 821 (6th Cir. 1989)). "[A]bsent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 574 (1968). Finally, an "adverse action," as required for a retaliation claim, is clearly established as action that "would deter a person of ordinary firmness from continuing to engage in that conduct[.]" *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). The Sixth Circuit has applied this standard in the employment context. *See Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010). For these reasons, there no doubt that Josephson's right to be free from retaliation for protected speech was clearly established. *Pickering*, 391 U.S. at 574. Josephson's speech likely falls within the broad category of speech protected because of the inclusive scope applied to speech by professors. *See Dambrot*, 55 F.3d at 1189. As a result, Josephson has established the first prong of the qualified immunity analysis. *See Pearson*, 555 U.S. at 236.

Next, Josephson has presented evidence to suggest that Defendants may have violated his First Amendment rights. Ganzel stated that Josephson's speech was did not reflect the University's culture [DE 64-3 at 1868] and ultimately approved his termination [DE 68-38 at 3887]. Woods instructed Josephson to give disclaimers when teaching on matters related to gender dysphoria. [DE 65-2 at 1950]. Boland recommended Josephson's non-renewal. [DE 68-34 at 3655]. Le collected complaints against Josephson and included them in a tracking document. [DE 65-4 at 1953–56]. Carter also collected complaints for the Josephson tracking document [DE 66-8 at 2256] and requested Josephson stop treating LGBTQ patients [DE 65-10 at 1970]. Lohr referred to Josephson's opinions about gender dysphoria as "unscientific." [DE 65-43 at 2138]. Viewing

16

the evidence in the light most favorable to Josephson, see *Shreve*, 743 F.3d at 134, he has presented facts sufficient to find a violation of his First Amendment rights by each Defendant. *Pearson*, 555 U.S. at 232. As a result, Defendants are not protected by qualified immunity. *See id.*

### C. Hostile Work Environment and the Statute of Limitations for § 1983 Claims

Defendants argue that Josephson has not asserted a viable hostile work environment claim. [DE 59-1 at 1067; DE 62-1 at 1441; DE 63-1 at 1591]. In response Josephson contends that Defendants unconstitutionally retaliated against Dr. Josephson, and in so doing imposed content- and viewpoint-based unconstitutional conditions upon him and breached his rights to due process and equal protection of law. [DE 72 at 4605].

To prevail in his retaliation claims, Josephson must show "(1) that . . . he engaged in a constitutionally protected activity, (2) that the defendant's adverse action . . . would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to" Josephson's speech. *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). With respect to the standards applied to adverse actions, the Sixth "Circuit has held that any action that would deter a person of ordinary firmness from exercising protected conduct will suffice, which may include harassment[.]" *See Fritz*, 592 F.3d at 724. This includes campaigns of harassment where individual acts may have been trivial but substantially gross when considered as a whole. *See Thaddeus-X*, 175 F.3d at 398. As stated in Section III.B.ii, Josephson has asserted facts sufficient to create a factual dispute regarding whether Defendants created a hostile work environment.

Defendants also contend that any cause of action based on actions before March 28, 2018, which includes Josephson's demotion, is barred by the one-year statute of limitations. [DE 58-1 at 949; DE 59-1 at 1063; DE 61-1 at 1328; DE 62-1 at 1437; 63-1 at 1587]. However, the Court

has already disposed of this argument in its Memorandum Opinion and Order on the Motion to Dismiss. [DE 23 at 634–36]. A § 1983 action arising in Kentucky has a one-year statute of limitation. *See Bonner v. Perry*, 564 F.3d 424, 430–31 (6th Cir. 2009). As the Court has held, "continuing violation" doctrine is an exception to the one-year statute of limitations. *Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003). "When a continuing violation is found, 'a plaintiff is entitled to have the court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred.'" *Id.* (quoting *Alexander v. Local 496, Laborers' Int'l Union of North America*, 177 F.3d 394, 408 (6th Cir. 1999)). "The paradigmatic example" of the first type "is a hostile work environment claim, where the cumulative effect of the acts manifests over time and not at one particular moment." *Click v. Thompson*, 926 F. Supp. 2d 972, 974 (E.D. Ky. 2013).

Because Josephson has provided facts sufficient to support his hostile work environment claims against each Defendant, the Court cannot confine Josephson to the one-year statute of limitations. *See id.* Josephson has asserted what amounts to a continuing violation of his constitutional rights. *Sharpe*, 319 F.3d at 266. Therefore, Defendants' contentions that actions prior to March 28, 2018, may not be considered under the one-year statute of limitations contradicts the law based on the evidence provided. *See id.*

### D.  Summary Judgment

As explained above, the parties filed seven competing motions for summary judgment arguing that the evidence supports judgment in their favor. [DE 58-1 at 957; DE 59-1 at 1087; DE 60-1 at 1267; DE 61-1 at 1334; DE 62-1 at 1443; DE 63-1 at 1594].

*i. Summary Judgment Standard*

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the nonmoving party must produce specific facts showing a material issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion.  *Id.* at 252.

The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party.  *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000).  But the nonmoving party must do more than show some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  *Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014).  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Liberty Lobby*, 477 U.S. at 252.

Rule 56(c)(1) requires that a "party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations

19

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

### ii.  Summary Judgment Analysis

In addition to reviewing the seven motions for summary judgment, the Court held a hearing to address questions related to the relevant facts and applicable standards.  [DE 95].  The parties filed supplements describing their competing characterizations of the facts.  [DE 94; DE 96-1]. Finally, without invitation from the Court, Plaintiffs filed a supplement detailing the disposition of a case in which Josephson provided an expert opinion [DE 97] and Defendants responded [DE 98].

When the Court ordered oral argument on the motions for summary judgment, the Court included several questions about facts underlying Josephson's claims and the Defendants' defenses.  [DE 92].  During the November 3, 2022, oral argument, the parties expressed varying views about the evidence.  [DE 95].  Although the parties agreed that certain documents exist, their characterizations of those documents could not be further apart.  This is most clearly demonstrated by the parties' supplements.  [DE 94; DE 96-1].  For example, both parties agree that Defendants created a document that consolidated complaints against Josephson.  [DE 96-1].  Josephson argues that this document is evidence that Defendants created a hostile work environment and retaliated against him because of his speech.  [DE 95].  Defendants, however, contend that this document is proof that Josephson was merely a disgruntled employee who abused the University's resources and created turmoil in his Division.  [DE 96-1].  Summary judgment for either party would be inappropriate here because there are still genuine disputes of material fact related to Josephson's claims.  *See* Fed. R. Civ. P. 56(a).  Neither Josephson nor Defendants have carried their burden to show there are no genuine issues of material fact.  *See Celotex Corp.*, 477 U.S. at 322.

Accordingly, the parties' motions for summary judgment [DE 58-1; DE 59-1; DE 60-1; DE 61-1; DE 62-1; DE 63-1; DE 64-1-1] are **DENIED**.

## III.    DEFENDANTS' MOTION TO EXCLUDE CANTOR'S EXPERT TESTIMONY [DE 56-1]

Defendants moved to exclude Cantor's expert testimony.  [DE 56-1].  They argue that his testimony "will not help the jury address any issue in this case and it is not a reliable presentation of the medical field's consensus view, if such consensus even exists."  [*Id.* at 774].  In response, Josephson claims Cantor's testimony meets all the hallmarks of admissibility.  [DE 69 at 4186].

### A.  Standard

The admissibility of expert testimony is set forth in Rule 702 of the Federal Rules of Evidence.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant."  *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir.2002) (alteration and internal quotation marks omitted).

> Under Rule 702 of the Federal Rules of Evidence, 'a proposed expert's opinion is admissible . . . if the opinion satisfies three requirements.  First, the witness must be qualified by knowledge, skill, experience, training, or education.  Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue.  Third, the testimony must be reliable.

*Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008)).

The Court does "not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Id.* (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)).  The Court must determine whether the witness is qualified to offer an opinion on the specific area of expertise.  *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2005 WL 1868046, at *33 (N.D. Ohio Aug. 8, 2005) ("An expert may be highly qualified to respond to certain questions and to offer certain opinions, but insufficiently qualified to respond to other, related questions, or to opine about other areas of knowledge.").  "Under the Federal Rules of Evidence, the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth.  The weight of the expert's testimony must be for the trier of fact." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981).

Along with qualifications, "[t]he Court must determine whether evidence proffered under Rule 702 'both rests on a reliable foundation and is relevant to the task at hand.'"  *Powell v. Tosh*, 942 F. Supp. 2d 678, 686 (W.D. Ky. 2013) (quoting *Daubert*, 509 U.S. at 597). To assist with this determination, the Supreme Court in *Daubert* laid out factors for the courts to consider.  *Daubert*, 509 U.S. at 592–94. Courts have "stressed, however, that *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. . . . [i]n some cases . . . the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience." *First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (finding that the *Daubert* factors "unhelpful" in a case involving "expert testimony derived

22

largely from [expert's] own practical experiences throughout forty years in the banking industry [because] [o]pinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation") (internal citations omitted).  "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 139 (1999).

## B.  Analysis

Defendants argue that Cantor's expert testimony should be excluded because it is not helpful [DE 56-1 at 774] and is unreliable [*Id.* at 776].  Plaintiff contends that Cantor's testimony will assist the trier of fact and is the product of reliable principles and methods.  [DE 69].

### i.  Relevance

Expert testimony is relevant if it "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  This helpfulness concern is "[t]he 'touchstone' of admissibility of expert testimony."  *Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002).  "Whether an opinion 'relates to an issue in the case' or helps a jury answer a 'specific question' depends on the claims before the court."  *Madej v. Maiden*, 951 F.3d 364, 370 (6th Cir. 2020).

Cantor's testimony explains the science surrounding gender dysphoria in children and professional guidelines.  [DE 56-3].  The expert report evaluates and analyzes various types of gender dysphoria and peer-reviewed literature.  [*Id.*].  It defines and contextualizes various terms often cited with gender dysphoria.  [*Id.*].  Cantor's testimony is relevant because it will provide the jury with context for Josephson's speech and the controversy that ensued.  Courts routinely allow experts to provide background on complex issues.  *See, e.g.*, *In re Heparin Prods. Liab. Litig.*, 803 F. Supp. 2d 712, 719–20 (S.D. Ohio 2011).  The advisory committee also explained

that background can be helpful in certain contexts: "[I]t might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case."  Fed. R. Evid. 702(a) advisory committee's note to 2000 amendments.  Accordingly, the Court finds that Cantor's testimony "will help the trier of fact to understand the evidence." *Id.*

ii. *Reliability*

To determine whether expert testimony is reliable, the Supreme Court articulated a nonexclusive serious of factors to consider. *Daubert*, 509 U.S. at 592–94.  The *Daubert* factors include:

> [w]hether a 'theory or technique . . . can be (and has been) tested'; [w]hether it 'has been subjected to peer review and publication'; [w]hether, in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation'; and [w]hether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.

*Kumho Tire Co.*, 526 U.S. at 149–50 (quoting *Daubert*, 509 U.S. at 592–94).  But those factors "should be applied only 'where there are reasonable measures of the reliability of expert testimony';" they "are not dispositive in every case." *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001).

Cantor's expert report cites over 70 references from which he derives his opinion.  [DE 56-3].  He cites a variety of scientific literature and peer-reviewed sources about gender dysphoria throughout his report.  [*Id.*].  Therefore, under Rule 702, Cantor's testimony consists of "sufficient facts and data."  Cantor also reviewed the video recording and transcript from Josephson's speech at the Heritage Foundation.  [DE 56-3 at 830].  His opinion is informed by the literature he cites and uses it to provide context to Josephson's speech.  [*Id.*].  Cantor's testimony involves no other scientific methodology aside from his own review, evaluation, and analysis based on his knowledge.  [*Id.*].  Thus, the Court finds that Cantor's testimony is "the product of reliable

24

principles and methods." Fed. R. Evid. 702.  Because the Court finds that Cantor's testimony is relevant and reliable, Defendants' Motion to Exclude Expert Testimony [DE 56-1] is **DENIED**.

## IV.    <u>CONCLUSION</u>

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that:

1.    Wood's Motion for Summary Judgment [DE 58-1] is **DENIED**;

2.    Carter's Motion for Summary Judgment [DE 59-1] is **DENIED**;

3.    Lohr's Motion for Summary Judgment [DE 60-1] is **DENIED**;

4.    Ganzel's Motion for Summary Judgment [DE 61-1] is **DENIED**;

5.    Le's Motion for Summary Judgment [DE 62-1] is **DENIED**;

6.    Boland's Motion for Summary Judgment [DE 63-1] is **DENIED**;

7.    Josephson's Motion for Summary Judgment [DE 64-1] is **DENIED**; and

8.    Defendants' Motion to Exclude Expert Testimony [DE 56-1] is **DENIED**.

Rebecca Grady Jennings, District Judge
United States District Court

March 8, 2023